**STATE of Missouri, Respondent,**

v.

**Nicklous D. CHURCHILL, Appellant.**

**No. SC 84695.**

Supreme Court of Missouri,
En Banc.

March 4, 2003.

Kent Denzel, Assistant State Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrew W. Hassell, Asst. Atty. Gen., Jefferson City, for Respondent.

### *Introduction*

RONNIE L. WHITE, Judge.

Nicklous D. Churchill appeals his conviction of first-degree statutory sodomy under section 566.062.[1] During the course of the trial one of the state's witnesses testified that the abuse allegedly incurred by the victim ("A.T.") "was real," thereby usurping the province of the jury. Because the trial court abused its discretion in overruling Churchill's objection, the judgment is reversed and the case is remanded for a new trial.

### II.

Churchill began a short-lived relationship with J.T. ("victim's mother") in mid-February 2000. Their relationship progressed for three to four weeks, ultimately resulting in Churchill residing with J.T. Churchill lived with J.T. for approximately ten days. During that time, Churchill lived out of a duffel bag and slept in the same bed with J.T. On or about March 22, 2000, Churchill and J.T. broke off their relationship, and Churchill moved out of J.T.'s home.

Shortly after Churchill moved out of their home, A.T. and her mother were playing a game. While playing the game, A.T. asked her mother if Churchill was coming back. When J.T. responded that he would not, A.T. expressed relief. A.T. then told her mother that Churchill touched her in her crotch and "hurt her." She told J.T. that Churchill locked her in the bathroom, took her panties off, dropped her on the floor and inserted his fingers into her crotch. A.T. told her mother these things had occurred five or six times and that Churchill did this while J.T. was asleep. A.T. had not mentioned the abuse earlier because she said Churchill warned her that if she awoke her mother it would anger her.

J.T. confronted Churchill with her daughter's allegations on or about March 29. Churchill denied the accusations. J.T. then contacted her pediatrician who referred her to the Department of Family Services ("DFS") for a Sexual Assault Forensic Evaluation ("SAFE") examination. J.T. arranged for A.T. to receive a SAFE examination, and it was conducted on April 12.

Dr. Hana Solomon conducted the SAFE examination of A.T. Prior to the examination, Dr. Solomon interviewed A.T. in order to assess her physical and psychological development. During that interview, Dr. Solomon asked A.T. about her mother's boyfriend, without specifically identifying Churchill. A.T. responded that her mother's boyfriend was named "Nick" and that she did not like him because he hurt

---

1. All statutory references cite to RSMo 1994 unless otherwise indicated.

her. She told Dr. Solomon that Churchill touched her while her mommy was asleep, "in her crotch," "under her pajamas," and "inside of her body."

Dr. Solomon then conducted the physical examination, which showed no bruising, swelling or lacerations. Although the examination conducted on A.T. was normal and showed no signs of abuse, Dr. Solomon told J.T. that it did not mean that A.T. had not been abused. She explained that any signs of such abuse would normally be gone within 72 hours of the contact and that their absence did not mean that the abuse did not occur.

As a result of A.T.'s statements, Churchill was arrested and charged with first-degree statutory sodomy.[2] Prior to trial a hearing was held pursuant to section 491.075 to determine the admissibility of A.T.'s testimony. During that hearing Dr. Solomon testified that her examination of A.T. and her extensive experience in conducting SAFE examinations led her to determine that A.T. was "very believable." At the conclusion of that hearing, the court advised the prosecutor that it did not want Dr. Solomon "to make any comment about the believability or lack thereof" of A.T.'s testimony when the case was actually tried.

At trial, Dr. Solomon testified as to her training during medical school and her professional experience in the area of child sexual abuse. As part of that testimony the prosecutor asked Dr. Solomon whether J.T. had reported any changes in A.T. that were indicative of abuse. Dr. Solomon described several behavioral changes that J.T. had related to her, including bedwetting and nightmares. J.T. told Dr. Solomon that her daughter had not exhibited any of those symptoms before the alleged

incident took place. The prosecutor then asked the significance of those changes, and Churchill objected prior to Dr. Solomon's answer. Churchill asserted that the doctor was about to give an opinion as to whether the alleged sexual abuse had actually occurred, and that the court had previously warned the witness not to give such opinion. The trial court overruled the objection, and Dr. Solomon stated that the changes meant, "a significant event had occurred in the girl's life."

In further testimony, Dr. Solomon explained that she considered A.T.'s history, demeanor and ability to give details that went beyond the scope of her developmental age, when assessing whether she had been abused. She said that A.T. had knowledge that was outside the range of normal experience for a child of her age. Further, she suggested that her change in demeanor when discussing the incident told her that the event A.T. was describing "was real" and "had occurred to her." Churchill immediately reiterated his objection and moved for a mistrial, asserting that Dr. Solomon was giving her opinion and intruding on the province of the jury. The court overruled that objection, and Churchill was eventually convicted of statutory sodomy.

### III.

▆ Trial courts have broad discretion in determining the admissibility of evidence. When this Court is asked to review the admissibility of evidence, it "reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial."[3] When determining the admissibility of opinion testimony, expert wit-

---

2. RSMo § 566.062.

3. *State v. Anderson,* 76 S.W.3d 275, 277 (Mo. banc 2002)(citing *State v. Johns,* 34 S.W.3d 93, 103 (Mo. banc 2000)).

nesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury.[4]

In cases involving the sexual abuse of a child, there are typically two types of expert testimony that give rise to a challenge: general and particularized. General testimony describes a "generalization" of behaviors and other characteristics commonly found in those who have been the victims of sexual abuse. Particularized testimony is that testimony concerning a specific victim's credibility as to whether they have been abused.[5] The trial court has broad discretion in admitting general testimony, but when particularized testimony is offered, it must be rejected because it usurps the decision-making function of the jury and, therefore, is inadmissible.[6]

The State concedes that the testimony by Dr. Solomon was improper. With the State's concession of impropriety in hand, the Court must determine whether Churchill suffered prejudice entitling him to a new trial.[7] The testimony of Dr. Solomon stating that the alleged abuse of A.T. "was real" introduced a real prejudice to Churchill. While this Court has previously held that "[u]nsolicited statements that are brief and limited in substance do not amount to reversible error in the absence of evidence that the prosecutor intentionally tried to inject unfair prejudice into the trial[,]" the brief nature of Dr. Solomon's statements in no way reflect the extent of their prejudice to Churchill.[8] Dr. Solomon's testimony that A.T.'s alleged abuse "was real" infringed upon the decision-making function of the jury and prejudiced Churchill by bolstering A.T.'s testimony with the credibility of a professional.

Although Dr. Solomon may have been sincere in her belief that A.T. was telling the truth, it is the province of the jury to make that conclusion. The trial court committed reversible error by refusing to sustain Churchill's objection.

## IV.

The judgment is reversed, and the case is remanded for a new trial.

All Concur.

---

4. *State v. Savory,* 893 S.W.2d 408, 410–11 (Mo.App.1995); *State v. Lawhorn,* 762 S.W.2d 820, 823 (Mo. banc 1988).

5. *State v. Williams,* 858 S.W.2d 796, 798–99 (Mo.App.1993).

6. *Id.*

7. While the State suggests that a mistrial is not required because Churchill did not request any "lesser" relief and, accordingly, did not give the court the option of striking the testimony without taking the drastic step of declaring a mistrial, it is not necessary for this Court to address that question because it was reversible error for the trial court judge to overrule the objection. Although the prejudice suffered by Churchill was severe, to comment on whether it necessitated a mistrial would amount to an advisory opinion.

8. *State v. Johnston,* 957 S.W.2d 734, 749 (Mo. banc 1997). The testimony Dr. Solomon provided deprived Churchill of a fair trial because there was no physical evidence indicating that sexual abuse occurred. The testimony was prejudicial considering that the state's other evidence consisted solely of the child-victim's inconsistent accounts of the matter and her subsequent behavior, both of which were matters Dr. Solomon's testimony directly bolstered. Although testimony such as Dr. Solomon's is always inappropriate, we reserve judgment as to whether such testimony necessitates a new trial in all situations.