STATE of Missouri, Plaintiff–Respondent,

v.

Clayton D. PRICE, Defendant–Appellant.

No. 26318.

Missouri Court of Appeals,
Southern District,
Division Two.

June 29, 2005.

Thomas D. Carver, Springfield, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Office of Attorney General, Jefferson City, for Respondent.

KENNETH W. SHRUM, Judge.

A jury found Clayton Price ("Defendant") guilty of statutory sodomy in the first degree (§ 566.062).[1] On appeal, Defendant charges the trial court committed plain error on four separate occasions

---

1. "A person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years old." § 566.062.1. Deviate sexual intercourse includes "a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger ... done for the purpose of arousing or gratifying the sexual desire of any person" or any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person. § 566.010(1).

when it did not *sua sponte* exclude certain at-trial testimony.[2] We affirm.

## FACTS

Since Defendant does not challenge the sufficiency of the evidence, we view the evidence that the jury heard in the light most favorable to the jury's verdict, disregarding all contrary evidence and inferences. *State v. Lopez*, 128 S.W.3d 195, 196[1] (Mo.App.2004).

M.A. ("Victim"), born June 16, 1995, lived primarily with her paternal grandmother, Jeanne Graves ("Graves"), for the first nine months of her life. From approximately March 1996 to March 2002, Victim resided with her mother, Tonya Cavaness ("Mother").

Mother began dating Defendant in December 2001, and he moved into her home one month later. On the morning of March 11, 2002, Victim called Graves from Mother's house and asked her "to come and pick me up." She told Graves that Defendant and Mother had been hurting her.

When Graves arrived, she found Victim crying, shaking, and terrified. After discussions among Graves, Mother and Victim's maternal grandmother, it was agreed Victim would go to Graves' house after Graves got off work. That evening, Victim "was still scared" and "would not talk about anything."

Three days later, Victim told Graves that Defendant touched her vagina and anus. The next morning (Friday), Graves reported this to the Division of Family Services. On Monday (March 18), Victim was examined by Mitzi Huffman ("Nurse Huffman"), a nurse practitioner with the local child advocacy center. After a general physical examination, Nurse Huffman sought to examine Victim via "colposcopy."[3] This proposed examination upset Victim and she "became extremely hysterical," exclaiming "you're not going to touch me, you're not going to put anything inside of me."

Ultimately, the procedure began after explanations and other attempts to calm Victim. Even so, Nurse Huffman characterized the examination as "inadequate" in that she was unable to complete it. The colposcopy videotape was reviewed by Dr. Lawrence Huffman ("Huffman"), who also worked at the child advocacy center.[4] He testified that it was "inadequate in many respects in terms you couldn't see inside [the vagina] very well." However, he did note a "scratch" that was "inside the outer edge of the vagina."

After the physical examination, Victim told Nurse Huffman that Defendant "hurt me, he put his fingers inside of me three times." Victim then recounted, via a diagram, where Defendant touched her.

Due to the inadequacy of the first vaginal examination, Victim was asked to undergo another such examination. She did so on March 27, 2002. After this second procedure, another videotaped interview of Victim was conducted. During this, Victim again told Nurse Huffman Defendant had touched her. When asked to indicate on a diagram of a female body where the touching occurred, Victim marked the genital and rectal part of the diagram.

Victim's at-trial testimony was that Defendant penetrated her vagina and anus

---

2. Under Rule 30.20, "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." All rule references are to Supreme Court Rules (2005).

3. This was explained as a "video physical exam" with a "very magnified view of the female genitalia."

4. Dr. Huffman and Nurse Huffman were husband and wife.

with his fingers.[5] Victim also told the jury that Defendant threatened to kill her and her paternal grandparents if she reported the abuse. She also testified that Cathy Adams, her maternal grandmother, told her to lie by telling the authorities that she made up the abuse allegations.

Defendant testified on his own behalf and told the jury that he did not sexually abuse Victim. Another defense witness (Mother) testified Victim wanted to live with Graves, and this desire was heightened "every time [Victim] would get mad at [Mother], if [Mother] wouldn't let her do what she wanted to do." Mother told the jury Victim "was out of control" and a discipline problem. She also said she never saw Defendant inappropriately touch Victim and that Victim was alone with Defendant on only two occasions.

Another defense witness (Victim's maternal grandmother) testified Victim told her "that she had lied" about the abuse. Finally, Dr. Robert Block, testifying for the defense, stated that the physical findings regarding Victim's rectum and vagina (as reported by the Huffmans) could not be linked to sexual abuse.

After the case was given to the jury, it deliberated twenty minutes and returned a guilty verdict. The court sentenced Defendant to twelve years' imprisonment. This appeal followed.

## Point I: Testimony Commenting on Victim's Credibility

■ Defendant's first point on appeal maintains the trial court committed plain error when it allowed Nurse Huffman and Dr. Huffman "to offer particularized expert testimony as to the veracity of [Victim's] testimony that she had been sexually abused." Defendant claims that their testimony improperly "invaded the prov-

ince of the jury in violation of [Defendant's] right to a fair trial."

■ As a general rule, "expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury." *State v. Churchill*, 98 S.W.3d 536, 538–39[3] (Mo. banc 2003). When an expert witness testifies that a particular witness is telling the truth, prejudice often arises because the expert's testimony invests scientific cachet to an issue (credibility) that the jury is capable of determining without an expert's help. *State v. Taylor*, 663 S.W.2d 235, 240–41 (Mo.banc 1984); *State v. Williams*, 858 S.W.2d 796, 798–800 (Mo.App.1993).

■ Even so, credibility assessments of child abuse victims by expert witnesses in criminal cases do not always mandate reversal. *Churchill*, 98 S.W.3d at 539 n. 8. Moreover, Defendant seeks plain error relief, which requires more than merely showing prejudice; he must show that an "error affected his rights so substantially that a miscarriage of justice or manifest injustice will occur if the error is left uncorrected." *State v. Rutherford*, 967 S.W.2d 679, 682 (Mo.App.1998).

■ In criminal cases charging sexual abuse of children, there are two types of expert testimony that typically give rise to a challenge: general and particularized. *Churchill*, 98 S.W.3d at 539. General profile testimony describes a generalization of behaviors and other characteristics commonly found in victims of sexual abuse which is usually admissible. *Id.*; *Williams*, 858 S.W.2d at 798–99. "Particularized testimony is that testimony concerning a specific victim's credibility as to whether they have been abused." *Churchill*, 98 S.W.3d at 539. In most instances,

---

**5.** Victim also testified that Defendant touched her with a knife and that "[h]e shoved it [the knife] in my butt and my pee-pee." Inexpli-

cably, the knife "touching" was left unexplained and unexplored by either the State or the defense.

this type of testimony, i.e., that which explicitly or implicitly vouches for a victim's credibility, is inadmissible. *Williams*, 858 S.W.2d at 799.

In the argument beneath Point I, Defendant claims Nurse Huffman "improperly gave particularized testimony concerning [Victim's] credibility." To support that conclusory comment, Defendant asserts that "Nurse Huffman *testified ... she believed* [Victim] because her 'injuries' were consistent with sexual abuse because of the 'knowledge and experience and history given by the child.'" (Emphasis supplied.) This argument fails, however, because it is based on a mischaracterization of the record. Nurse Huffman *never* testified she *believed* Victim. To the contrary, Nurse Huffman's testimony was that, in her opinion, the injuries noticed on the first examination (rectal scarring) *were consistent* with sexual abuse. This was based on her knowledge, training, twenty-nine years of experience, Victim's social and medical history, and the injuries themselves. Such testimony, i.e., the rectal scarring observed on Victim was "consistent" with sexual abuse, was admissible expert testimony. *Taylor*, 663 S.W.2d at 239; *see also State v. Pollard*, 719 S.W.2d 38, 41–42 (Mo.App. 1986) (finding no manifest injustice when a doctor testified that injuries were *caused* by sexual abuse rather than stating the injuries were *consistent with* abuse).

Turning to another part of his first point, the following is an excerpt lifted from the argument section of Defendant's brief:

"Nurse Huffman was particularly impressed with [Victim's] ability to discern feelings of anger toward her mother, a skill not normal for a child [Victim's] age. She testified:

'There's a great deal of psychological data behind it, but for a child of that age to be aware of her feelings and be able to separate them, being mad and sad because of the loss of feeling protected by her mother, *was profound for me.*'

"Nurse Huffman also testified that despite performing 150 to 200 SAFE exams each year, she remember[ed] [Victim] 'for a lot of *personal reasons,*' a fact not relevant for any other purpose other than to convey to the jury that she believed the child.

"Nurse Huffman's testimony is no different from the particularized expert testimony the court in *Churchill* found to be reversible error. Her belief that [Victim] was abused was based on the child's history, demeanor and especially her ability to discern emotion that went beyond the scope of her developmental age.

"Further, Nurse Huffman placed [Victim] at the top of the list of children she had interviewed over the years, which could have no other effect but to convince the jury that more than any other child, [Victim] was telling the truth. This testimony in effect quantified the believability of [Victim's] testimony because her story stood out more than any other heard by Nurse Huffman." (Emphasis supplied.)

This "argument" comprises all of Defendant's reasons regarding why he claims that Nurse Huffman's *"profound"* impact observation and her *"personal reasons"* remark constituted particularized comments about Victim's veracity and why they led to a miscarriage of justice or manifest injustice.[6] However, it is an ar-

---

6. The last paragraph we have quoted from Defendant's brief seems to imply that the "top of the list" comment was part of Nurse Huffman's testimony; that Huffman made some

"top of the list" remark which tended to quantify the believability of Victim's testimony. This simply did not happen, that is to

gument that gives little or no explanation of why this is so. The need to fully develop such argument is especially important, when as here, much of the questioned testimony was ambiguous at best.

The plain error rule is to be used sparingly, and it does not provide an avenue of relief for every trial court error that has not been properly preserved. *State v. Johnson*, 150 S.W.3d 132, 136[3] (Mo.App. 2004). "Plain errors are evident, obvious, and clear, and we determine such errors exist based on the facts and circumstances of each case." *Id.* at 136[4]. A plain error claim must establish *on its face* substantial grounds for an appellate court to believe a manifest injustice or miscarriage of justice will result if the error is left uncorrected. *Id.* at 136[5].

Defendant's arguments about Nurse Huffman's testimony fall far short of this standard. Her "profound" impact testimony and her "personal reasons" statement are nothing more than isolated, ambiguous comments that were neither highlighted nor stressed by the State. Defendant has not explained how, nor can we discern how, these ambiguous remarks could be interpreted as vouching for Victim's credibility. Because of the ambiguity of these statements, we decline to review for plain error. This follows because Defendant cannot facially show that the alleged errors were obvious, evident, and clear errors. *Johnson*, 150 S.W.3d at 136[4].[7]

Defendant's final claim of trial court error under Point I relates to Dr. Huffman's testimony about why the colposcopy videotapes of children are routinely destroyed by the child advocacy center. He testified that destruction of such tapes was not an unusual practice because "[t]he videotapes represent a real pot of gold for anyone who would want to misuse these." To explain, Dr. Huffman testified:

"Well, they could put them out on the Internet for one thing. They could steal them and put them out on the Internet. They—child abusers and pedophiles delight in having video pictures of what has happened or what they've done, and they share these, one with another, and they are able to sort of have sexual stimulation on demand, you would think, by being able to run the video again."

The following is Defendant's argument for reversal because of this testimony:

"Dr. Huffman believed that it was necessary to destroy the videotape of [Victim's] exam to keep the tape out of the hands of her abuser. His statements conveyed to the jury the message that [Victim] was in fact sexually abused and that he protected her from further exploitation by destroying the videotape of her colposcopy exam."

The subject videotapes were a product of the colposcopy examinations of Victim. They were described as videotapes that magnified the genitalia of the child subject "25 to 50 times" normal size. Also, the center (where the tapes had previously

---

say, Nurse Huffman did not make a "top of the list" remark. Apparently, Defendant chose "top of the list" language as his characterization of the other remarks by Huffman about which Defendant complains.

7. Assuming, *arguendo*, we had exercised our discretion to review for plain error, Defendant's arguments would still fail. Nurse Huffman's testimony took up eighty pages of trial transcript and we are persuaded that her

comments about which Defendant complains could have had virtually no effect on the jury. Moreover, to the extent that Nurse Huffman's testimony could be interpreted as commenting on Victim's veracity, it is reasonable to infer she was simply saying she believed Victim's *statements to her*. When thus interpreted, such testimony was admissible. *See State v. Tyra*, 153 S.W.3d 341, 349 (Mo.App.2005); *State v. Cone*, 3 S.W.3d 833, 843 (Mo.App. 1999).

been stored) was subject to break-in attempts. Moreover, in some instances, the faces of the children being examined could be seen in the video. When Dr. Huffman's comments are read in this context, it becomes clear that he was not referring to Defendant as a sexual abuser. Nor can it be said, via use of this comment, Dr. Huffman believed that abuse actually occurred. With the genitalia magnified on the videotape, any pedophile or child abuser in possession of the tapes might use them to gain sexual gratification regardless of whether the child subject suffered abuse. We find no plain error in the admission of Dr. Huffman's testimony describing why the videotapes were destroyed.

Defendant's first point is denied.

### Point II: "Adam's Scale" Testimony

■ Defendant's second point charges the trial court plainly erred when it allowed Dr. Huffman to testify about the "Adam's Scale."[8] Defendant asserts the trial court should have *sua sponte* precluded Dr. Huffman from testifying about the scale. He premises this argument on the fact that there was no evidence adduced showing the general scientific acceptance of its use. As such, he claims the testimony was inadmissible because it was not shown that the Adam's Scale met the standards of admission of scientific evidence in criminal cases. Defendant's argument fails, however, because he has waived any

alleged error stemming from admission of this evidence.

To explain, Dr. Huffman first testified only to the general nature of the scale, i.e., he told the jury what it was. He then attempted to tell the jury what application of the scale to Victim would show, i.e., testimony about the degree of probability that Victim was abused by use of the scale. Thereon, defense counsel objected that this would impermissibly allow Dr. Huffman to testify about the "ultimate issue" in the case. The prosecutor responded that the testimony did not deal with an ultimate issue, namely, that Defendant committed abuse, but rather dealt with the question of whether abuse in general occurred. At this point defense counsel asked to go "[o]ff the record," a request the court granted.

Later, the judge announced the end of the off-record session, and the proceedings returned to open court with a discussion among the attorneys and the trial judge outside the hearing of the jury. Then, defense counsel affirmatively stated, "I'll withdraw the objection." With the record in that posture, Dr. Huffman told the jury the results of his use of the Adam's Scale to gauge the probabilities that Victim suffered abuse.

When defense counsel told the court that the objection was withdrawn, he informed the court that he, in fact, had *no objection* to the evidence.[9] Consequently,

---

8. At trial, this scale was described as "objective" and "sorts out physical and historical findings, and then gives us a level of certainty about abuse having happened." Essentially, the scale uses a number of factors, including physical findings, social history, and medical history, to place into a category a case of alleged abuse. There are three levels of categories indicating the degree of probability that abuse occurred.

9. Implicitly, Defendant argues that his complaint on appeal is different from that voiced in the objection at trial, i.e., a comment on

Victim's truthfulness versus a lack of foundation. We do not know if the foundational argument was put before the court off the record. Regardless, Defendant's argument on appeal focuses on the prejudicial nature of the testimony as one involving a comment on Victim's credibility which is precisely the objection raised at trial. That certainly has been waived; thus, Defendant's point is without merit. Moreover, even if we could review for plain error, we could make no determination as to the scientific foundation for the scale because no record was made tending to

this court's holding in *State v. Williams*, 118 S.W.3d 308 (Mo.App.2003), resolves the point adversely to Defendant.

"No criminal trial or judgment should be affected, in any manner, by an error committed at the instance of the defendant. *State v. Goudeau*, 85 S.W.3d 126, 129 (Mo.App.2002); § 545.030.1. As distinguished from a simple failure to object, announcement by the defense of 'no objection' amounts to an affirmative waiver of appellate review of the issue."

*Id.* at 313[10,11].

This hard and fast rule attends even when a defendant seeks plain error review. *Id.* at 313. The reason for this is explained in *State v. Yole*, 136 S.W.3d 175 (Mo.App.2004).

"To hold generally that a party does not waive plain error review on direct appeal when affirmatively assenting to the introduction of evidence ... places the trial court in a precarious position. Counsel appropriately resents judicial interference in their appropriate representation of a client during trial. Counsel makes many tactical decisions at trial, and the court is not privy to the mental process in determining the tactical approach employed by counsel. Thus, when counsel affirmatively represents to the court the waiver of any objection to the introduction of evidence, the court can assume that counsel's decision is reasoned and calculated and that counsel does not want the court to preclude introduction of the evidence."

*Id.* at 180.

Point II is denied.

### Point III: "Uncharged Bad Conduct" Testimony

■ Defendant's third point again seeks plain error review of an alleged trial court error. Specifically, he characterizes

certain remarks by Nurse Huffman as "uncharged bad acts" testimony, i.e., that Defendant had sexually abused another child. He insists that such testimony resulted in manifest injustice or a miscarriage of justice. We disagree.

■ It is axiomatic that the "accused has the right to be tried only for the crimes with which he [or she] has been charged." *State v. Stallings*, 957 S.W.2d 383, 390[13] (Mo.App.1997). Consequently, evidence of prior bad acts or misconduct is inadmissible to show that an accused has a propensity to commit the charged crime. *State v. Tolliver*, 101 S.W.3d 313, 315[2] (Mo.App.2003).

■ "To violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other crimes or misconduct." *State v. Ponder*, 950 S.W.2d 900, 911–12[14] (Mo.App.1997). "Vague references are not characterized as clear evidence associating a defendant with other crimes." *State v. Bolds*, 11 S.W.3d 633, 638 (Mo.App.1999).

Defendant points to two instances where Nurse Huffman allegedly associated Defendant with other sexual misconduct. The first came as she explained why she initially met with Victim. In that regard, Nurse Huffman testified:

"Part of the protocol for our center is that when a social worker, in this instance, calls in, we ask them to send a written outline declaring the patient's name, age, insurance numbers, phone numbers and a one-page—one line—and when this child was scheduled not by me, but by our coordinator, it stated

show whether the scale met the admissibility    requirements.

that a two and a six-year-old female . . ."

Thereon, the prosecutor interrupted her and the court instructed her to only answer the prosecutor's "very specific question."

The other alleged "bad conduct" testimony came as Nurse Huffman was describing a State exhibit. This exhibit depicted a female body form on which Victim wrote numbers to indicate how many times she was touched. During this, the prosecutor asked Nurse Huffman about a "backwards 3" on the exhibit and what it was "in response to." She replied, "[h]ow many times, I believe that her—she stated that her sister had been—." Thereon, the prosecutor interrupted, saying: "No, no, just talk to me about [Victim.]"

We set out the questioned testimony verbatim because it clearly shows that it did not violate the rule prohibiting evidence of other crimes or misconduct by the accused. Even if viewed most favorably to Defendant's position, Nurse Huffman's comments cannot be characterized as *clear evidence* that *definitely* linked Defendant to other crimes or bad conduct. *Ponder,* 950, S.W.2d at 911–12. At most, her comments could only be characterized as "vague references" that do not afford Defendant any relief under the plain error standard. *Bolds,* 11 S.W.3d at 638. Point III is denied.

### Point IV: Testimony About the Colposcopy Videotape

■ In his final point, Defendant alleges the trial court committed plain error when it allowed testimony concerning the videotapes made of the colposcopy. He argues that, since the videotapes were destroyed, he was deprived of the opportunity to view them and to effectively challenge testimony concerning them.

In the argument section of his brief, Defendant claims that the State was given an "unfair advantage" during the trial because its experts (the Huffmans) were able to testify that the videotape depicted "injuries." He argues that his expert's opinion was devalued by the jury because Dr. Block did not view the tape. As such, Defendant states that the jury was unable to adequately assess whether the depictions of the videotape constituted "injuries" of sexual abuse or merely neutral "findings." He claims this violated his "due process rights."

Assuming *arguendo* that the Huffmans' acts of destroying the videotapes can be considered subject to constitutional requirements, we note the following. The destruction of "potentially useful evidence" can constitute a violation of due process; however, the defendant must show that the state actor (usually the police or the prosecution) acted in bad faith. *Illinois v. Fisher,* 540 U.S. 544, 547–48, 124 S.Ct. 1200, 1202, 157 L.Ed.2d 1060 (2004); *State v. Burns,* 112 S.W.3d 451, 455 (Mo.App. 2003).

■ We find no due process violation here because Defendant has utterly failed to show that the destruction of the videotapes occurred as the result of bad faith. The undisputed evidence showed that Huffmans destroyed the tapes to protect the identity of Victim and to protect the confidentiality of the obvious private nature of the examination. This was done, in part, because the center was subject to break-in attempts to steal such videos. Defendant cannot show that the videotapes were destroyed in bad faith. "Failure to preserve potentially useful evidence does not constitute the denial of due process without a showing of bad faith." *Burns,* 112 S.W.3d at 455[7]. Point denied.

The judgment of conviction and sentence is affirmed.

PARRISH, P.J., and BATES, C.J., concur.