**STATE of Missouri, Plaintiff–Respondent,**

v.

**Xavier V. ARTIS, Defendant–Appellant.**

No. 27128.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 27, 2007.

Craig A. Johnston, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Stephanie Morrell, Assistant Attorney General, Jefferson City, for respondent.

## PHILLIP R. GARRISON, Judge.

Xavier V. Artis ("Defendant") was convicted following a jury trial of the class C felony of assault in the second degree, a violation of Section 565.060,[1] and forcible rape, a violation of Section 566.030. On appeal, Defendant contends that the trial court erred in: (1) overruling his motion for continuance; (2) overruling his objection to the admission of a videotape deposition of a State witness; (3) overruling his request for the disclosure of J.K.'s ("Victim") psychological and psychiatric records; and (4) failing to *sua sponte* declare a mistrial or issue a curative instruction when the State's expert witness commented on Victim's credibility. We affirm.

Defendant does not challenge the sufficiency of the evidence supporting his convictions. Viewed in the light most favorable to the verdict, the record reveals the following. On May 11, 2000, Victim met Defendant while at a Laundromat. Defendant said his name was "Darrum" and after talking awhile, the two drove around in Defendant's car. Defendant eventually dropped Victim off at home, but they made plans to go out to a club the following night.

The next evening, Defendant arrived at Victim's house, which she shared with her aunt, Shonna Walker, ("Walker") and her brother, Terry Kingcade ("Terry"). Defendant drove the three around to various places, including Wal–Mart and Ryan's Steakhouse. Ultimately, Defendant and Victim decided not to go out, instead opting to watch a movie in Victim's upstairs bedroom.

Later that night, Defendant again agreed to drive everyone to Wal–Mart. When they returned, Defendant and Victim went back upstairs to watch the rest of the movie. Victim eventually fell asleep but was awakened when Defendant asked her for a kiss.[2] When Victim said she would not give him a kiss, Defendant leaned over her as if he was going to give her a hug, but instead he began choking her with his arm around her neck. Victim passed in and out of consciousness, but at one point awoke to find Defendant sitting on top of her choking her with his hands. When she told Defendant that she could not breathe, he said he knew and "that it'd be okay." After Victim regained consciousness, her eyes were sore and her vision was blurry. She also discovered that she was lying on her back with her arms, legs, and mouth duct taped.

Defendant told Victim that "he was just looking at [her]," and "that he had a surprise for [her]." He then pulled a butcher knife out from under the bed, and asked Victim if she knew that he could kill her. Defendant removed the duct tape from Victim's mouth and started asking about Terry. Defendant told her that he had been hired to kill Terry, but that he had seen her and was interested in her. Defendant asked Victim if she would have sex

1. All statutory references are to RSMo (2000), and all references to rules are to Missouri Rules of Criminal Procedure (2005), unless otherwise indicated.

2. At this point, nothing romantic or sexual had taken place between Victim and Defendant.

with him, saying that if she did, she would not die. He then rolled Victim over on her stomach, pulled down her pajama bottoms and inserted his penis in her anus, while hitting her shoulder with the butcher knife. While Victim at times passed in and out of consciousness, she remained conscious during this portion of the assault. Afterwards, Victim again asked Defendant if she was going to die, and he told her that he would have to think about it.

Defendant then wrapped Victim up in a sheet, sat her on the bed against the wall, and told her that he was going to let her live if she did not go to the police. He cut the duct tape off of Victim with the butcher knife, placing it, along with several of Victim's things that he had touched, in a bag. He then told Victim to take a shower. Victim had trouble standing so Defendant helped her into the bathroom, telling her that "he wasn't a bad guy." Before getting into the shower, Victim looked into the mirror and noticed that her eyes were red and puffy. After she had taken a shower, Defendant told Victim to put on her makeup, and to tell everyone that the reason her eyes were red and puffy was because her "allergies [were] bothering [her]."

Before he left, Defendant told Victim to "stay in her room for two hours," because he would know if she went downstairs, and he would break in and kill everyone. After Defendant left, Victim remained in her bedroom, but she saw Defendant drive by her home three times through her bedroom window. Approximately two hours later, Victim's parents drove up and her mother ("Kathy") came to the door. Initially, Kathy did not recognize Victim, because her face was so swollen and bruised, but upon recognizing Victim's voice, Kathy screamed for Victim's father to come into the house. Kathy took Victim into the bathroom to see if she would tell her what

had happened. Victim showed Kathy her wrists and ankles, which still had adhesive from the duct tape. Kathy also noticed adhesive in Victim's hair. Eventually, Victim told her father a little of what Defendant had done to her and she asked him to take her to Wal–Mart, where she thought that both she and Defendant were on a surveillance tape from the night before.

Victim's parents took her to Wal–Mart, where they viewed the surveillance tapes, after which they called the police and paramedics. Victim was interviewed by Officer Nina Sala–Gault ("Officer Sala–Gault"), and was eventually taken to the hospital where a medical examination was performed, and a "rape kit" was collected.

The medical examination revealed that: Victim's face had bruising; she had bleeding in the white part of her eyes; she had a black eye; her face and neck had numerous burst blood vessels; and her eardrums were bleeding. Victim's injuries were serious and were consistent with her having been strangled over several minutes.

On May 15, 2000, Corporal Doug Thomas ("Corporal Thomas") interviewed Victim at the Springfield Police Department. Victim told Corporal Thomas that Defendant had told her his name was "Darrum." She described Defendant to Corporal Thomas and told him some of the locations she had visited with Defendant. Corporal Thomas visited those locations and discovered that Defendant's true name was Xavier Artis. Using Defendant's real name, Corporal Thomas was able to obtain a photograph of Defendant from the Department of Revenue, which Victim was able to identify from a photographic lineup.

On March 21, 2001, Corporal Thomas met with Defendant at the Springfield Police Department, where he collected a reverse rape kit, which was compared to the rape kit collected from Victim. While Victim only recalled being anally sodomized,

Defendant's DNA profile was found on the vaginal swab from Victim. Victim's anal swab from her rape kit contained no semen.

Defendant was arrested and charged with the class B felony of assault in the first degree, a violation of Section 565.050, the class B felony of kidnapping, a violation of Section 565.110, forcible sodomy, a violation of Section 566.060, and forcible rape, a violation of Section 555.030. Defendant was also charged as a prior and persistent offender.

This is the second trial of Defendant stemming from these charges. Following the first trial, we reversed Defendant's convictions and remanded the case for a new trial, because Defendant was denied the right to represent himself. *See State v. Artis*, 146 S.W.3d 460 (Mo.App. S.D. 2004). In his second trial, Defendant waived his right to counsel and proceeded pro se. In that trial, the jury found Defendant guilty of assault in the second degree and forcible rape, but acquitted Defendant of assault in the first degree, kidnapping and forcible sodomy. Defendant was sentenced as a prior and persistent offender to fifteen years for second degree assault, and life for forcible rape with the sentences to run consecutively. This appeal followed.

Defendant brings four points on appeal. For the sake of clarity, we will first address his second point, which challenges the trial court's admission of the videotaped deposition of Corporal Thomas. Defendant alleges that the admission of the videotaped deposition violated his right to confrontation and cross-examination. We disagree.

The facts relevant to this point are as follows. On December 7, 2004, while Defendant was still represented by counsel, the State filed a motion to preserve the testimony of Corporal Thomas by video-taped deposition. The motion alleged that Corporal Thomas was leaving the country for Iraq in January 2005, to train Iraqi police officers, and would not return until April or May of 2005, making him unavailable to testify at trial, which was then set for March 14, 2005. After holding a hearing, the trial court sustained the State's motion. In doing so, the trial court found that, pursuant to Rule 25.14, "the deposition is necessary to preserve the testimony of [Corporal] Thomas in two respects, one is his prospective training mission that he's going on to Iraq for purposes of training the civil police in that country; and then secondly, ... that he is in fact going into a war zone." The trial court further found that Defendant would have "sufficient time to adequately prepare for the deposition as required by [Section] 492.303."

Defendant waived his right to be present at the deposition of Corporal Thomas, but Defendant's counsel was present and cross-examined Corporal Thomas. Corporal Thomas testified that he was leaving for Iraq in mid to late January 2005 to train Iraqi police officers. He expected to be gone for three to four months, which would include the week of the scheduled trial.

On February 15, 2005, Defendant waived his right to counsel and elected to represent himself. At a motions hearing held on March 9, 2005, the State informed the trial court that Corporal Thomas planned to be on a three-month tour, which would bring him back "sometime in May," but that his tour could be extended an additional two months. The trial court told the State to continue monitoring the situation, and requested that the State keep the trial court informed as to whether a "firm date" existed for Corporal Thomas' return. The trial court stated that if Corporal Thomas was unavailable at

the time of trial, his deposition may be used by the State in lieu of testimony.

On May 2, 2005, Defendant filed a motion to suppress the videotaped deposition of Corporal Thomas, which was denied. The trial was held on May 2–5, 2005. The State offered the videotaped deposition into evidence on May 4, 2005. In Defendant's motion for new trial, he argued that the trial court erred in allowing the deposition of Corporal Thomas and in denying his motion to suppress the deposition.

■ The trial court has broad discretion in admitting or excluding evidence at trial. *State v. Bryan,* 60 S.W.3d 713, 718 (Mo.App. S.D.2001). The trial court's ruling concerning the admission or exclusion of evidence will not be disturbed absent a clear abuse of that discretion. *Id.* The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Woodson,* 140 S.W.3d 621, 629–30 (Mo.App. S.D. 2004).

■ The Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him. . . ." U.S. CONST. amend. VI; *see Bryan,* 60 S.W.3d at 718. Similarly, the Missouri Constitution provides that "in criminal prosecutions the accused shall have the right to . . . meet the witnesses against him face to face. . . ." MO. CONST. Art. I, § 18(a). The Sixth Amendment applies to criminal proceedings in state courts through application of the Fourteenth Amendment which prohibits the deprivation of life or liberty without "due process of law." *State v. Glaese,* 956 S.W.2d 926, 930 (Mo.App. S.D.1997). "Therefore, a criminal defendant is constitutionally guaranteed the right under the Sixth Amendment to confront the witnesses against him or her and to have the opportunity for effective cross[-]examination of any witnesses who appear and testify against him or her." *Id.* "Of these guarantees, the 'primary interest' secured by 'the confrontation clause' is the right of cross-examination.'" *State v. Foust,* 920 S.W.2d 949, 955 (Mo.App. E.D.1996) (quoting *Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987)).

■ Although depositions may be taken by the State in accordance with the rules of civil procedure, their use is governed by the rules of criminal cases. *See* Rules 25.14 and 25.16; *see also* Section 492.303. The State cannot use a deposition as substantive evidence at trial unless the witness deposed is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177, 203 (2004). "To show unavailability, the [S]tate has the burden of proving a good faith effort, exercising reasonable diligence, to obtain the presence of the witness at trial." *Glaese,* 956 S.W.2d at 931.

Rule 25.14 authorizes the State to take depositions to preserve the testimony of a witness. Where the witness is an "essential witness," Section 492.303 authorizes the use of a videotaped deposition. Consistent with the protections of the Sixth Amendment, Rule 25.16 conditions admissibility of deposition testimony on the unavailability of the witness. That rule provides, in relevant part, as follows:

[A]ny deposition obtained in accordance with Rules 25.12, 25.14 or 25.15, so far as it is otherwise admissible under the rules of evidence, may be used by the state if:

(a) The defendant:

(1) Was personally present at the deposition and had the right of confrontation and cross-examination at the deposition, or

(2) Personally waived that right to be present and the right of confrontation in writing or in open court . . . ; and

(b)(4) The witness . . . [i]s otherwise unavailable and the state has made a good faith effort to obtain the presence of the witness at the hearing or trial, but has been unable to procure the attendance of the witness.

Here, Defendant asserts that the State did not meet its burden of showing that Corporal Thomas was unavailable. Particularly, Defendant argues that the State failed to show "that it had made a good faith effort, exercising reasonable diligence, to obtain [Corporal] Thomas' presence at trial, because the State knew that [Corporal] Thomas was voluntarily leaving the country yet it failed to serve him with a subpoena before he left[.]"

We reject Defendant's argument. In doing so, we find *Bryan*, 60 S.W.3d 713, instructive. In that case, the trial court sustained the State's motion to preserve the testimony of a witness by videotaped deposition because he was leaving the country. *Id.* at 717. The defendant was present at the deposition with his counsel. *Id.* On appeal, the defendant alleged error in the admission of the deposition of the witness, arguing, *inter alia*, that the State failed to use diligence to obtain the witness' presence at trial. *Id.* We noted, in that case, "that during the course of the deposition [the witness] testified that he was to 'go to Germany for a couple of weeks [for deployment] off of Kosovo.'" *Id.* at 718 (alteration in original). In rejecting the defendant's argument, we explained that "[t]his testimony obviated the requirement of Rule 25.15 [now Rule 25.16] to show a 'good faith effort to obtain

the presence of the witness at the hearing or trial.'" *Id.*

■ Similarly, in the present case, the State filed a motion to preserve the testimony of Corporal Thomas pursuant to Rule 25.14 and Section 492.303, because he was leaving the country and was not returning until after the scheduled trial date. Defendant waived his right to be present at the deposition but was represented by counsel. At the deposition, Corporal Thomas testified that he would be in Iraq from January through April or May of 2005. The trial was reset several times, but was ultimately held on May 2–5, 2005. Throughout this time, the State monitored the whereabouts of Corporal Thomas. As of the time of Defendant's trial, Corporal Thomas had not returned from Iraq. As in *Bryan*, Corporal Thomas' presence in Iraq throughout the course of the trial "obviated the requirement of Rule [25.16] to show a 'good faith effort to obtain the presence of the witness at the hearing or trial.'" 60 S.W.3d at 718.

■ The admission of Corporal Thomas' deposition testimony did not violate Defendant's right to confrontation and cross-examination, because Corporal Thomas was unavailable and Defendant, through his counsel, had a prior opportunity to cross-examine Corporal Thomas. *See Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. Defendant's second point is denied.

■ We now turn to Defendant's first point, where he maintains that the trial court abused its discretion in overruling his motion for continuance to secure the presence of Corporal Thomas at trial. Defendant argues that by overruling his motion for continuance, "his rights to due process, a fair trial, and confrontation and cross-examination" were violated. We disagree.

Defendant first requested a continuance on March 9, 2005, because he had not yet received the case file from his previous attorney, and he also wished to have the trial set on a date when Corporal Thomas would be able to testify. The trial court granted Defendant's motion for continuance so that he would have time to receive the case file from his former attorney and prepare for trial. The trial court told the State to continue monitoring the situation regarding Corporal Thomas, and requested that the State keep the trial court informed as to a whether a "firm date" existed for Corporal Thomas' return. The trial court stated that if Corporal Thomas was unavailable at the time of trial, his deposition may be used by the State in lieu of testimony. The trial was then set for May 23, 2005.

At a hearing held on March 16, 2005, the State requested that the trial date be moved up, because one of its witnesses was pregnant and her due date was close to the date of the then current trial setting. Defendant, who had done most of his pre-trial preparation, said that he would be ready for a May 2, 2005 trial date, so the trial was reset for that date.

On April 28, 2005, during the pretrial conference, the trial court heard another motion for continuance filed by Defendant, which stated that he would like to confront Corporal Thomas "face to face" and have an opportunity to cross-examine him. The State informed the trial court that it had attempted to serve a subpoena on Corporal Thomas at his house, and was informed that he would not be back until May 6, 2005. The trial court denied Defendant's motion for continuance, stating that, "I want the record to be clear that the setting of this case has not revolved around the availability of [Corporal] Thomas, and those issues having been previously decided by the Court."

"The decision to grant or deny a continuance is within the sound discretion of the trial court." *Woodson*, 140 S.W.3d at 629. Defendant must make a very strong showing to prove abuse of that discretion. *Id.* The party requesting the continuance also bears the burden of showing prejudice. *Id.*

When a continuance request is based upon the absence of a witness, Rule 24.10 requires the application show the materiality of the potential testimony, the particular facts the witness will prove, due diligence on the part of the defendant to obtain the testimony, and reasonable grounds to believe the attendance or testimony of the witness will be procured within a reasonable time. *State v. Patton*, 84 S.W.3d 554, 556 (Mo. App. S.D.2002). "[T]he refusal to grant a continuance for a missing witness will not be reversed on appeal unless the witness's testimony would probably result in a different outcome." *Id.*

Assuming *arguendo* that the trial court abused its discretion in denying Defendant's motion for continuance, Defendant has not shown prejudice by this denial. This is not a case where the jury was unable to hear the testimony of an absent witness. As previously related, Corporal Thomas's testimony was preserved via videotaped deposition and was properly admitted at trial. This case is unique in that Defendant sought a continuance, not to ensure the availability of his own witness, but to obtain the presence of the State's witness. In his application for continuance, Defendant provided the following: "[Corporal] Thomas has impeaching information of the complaining witness[;]" and "[Corporal] Thomas under oath said . . . [D]efendant waived his [M]iranda rights and chose not to talk which was untrue." It is clear from Defendant's application for continuance and in his argu-

ment on appeal that Defendant sought a continuance so he could cross-examine Corporal Thomas at trial.

As previously related, Defendant, through counsel, had the opportunity to cross-examine Corporal Thomas at the deposition. Because that testimony was properly before the jury, as discussed earlier in this opinion, Defendant has not identified any testimony which would have resulted in a different outcome. This point is denied.

■■■■ In his third point, Defendant asserts the trial court abused its discretion in overruling Defendant's request for the disclosure of Victim's medical records, and in failing to conduct an *in camera* inspection of those records, because Defendant made a plausible showing how those records might be relevant to his defense. Defendant maintains that the trial court's ruling violated his "rights to confront the witnesses against him, to due process and a fair trial, to compulsory process, and to present a defense[.]" We disagree.

> The abuse of discretion standard applies when reviewing claims of denial of meaningful discovery and concerning the relevancy and admissibility of evidence.... When reviewing a claim that a defendant was denied meaningful discovery, the appellate court will determine whether the trial court abused its discretion in such a way as to result in fundamental unfairness. Fundamental unfairness occurs when the state's failure to disclose results in defendant's genuine surprise and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence. However, a defendant is not entitled to information on the mere possibility that it might be helpful, but must make some plausible showing how the information

would have been material and favorable.

*State v. Taylor*, 134 S.W.3d 21, 26 (Mo. banc 2004) (internal citations and quotations omitted).

■■■■ For records which may contain privileged information, such as psychiatric records, the trial court may conduct an *in camera* review to determine if the records are actually privileged. *State v. Davis*, 186 S.W.3d 367, 372 (Mo.App. W.D.2005). "The material that does not fall under the privilege is discoverable if it is relevant to the subject matter involved in the pending action." *Id.* However, to be entitled to an *in camera* review, the requesting party must make an adequate showing. *Id.* "A showing must be more than a mere possibility that the material contains relevant or exculpatory evidence. There must be a showing of a factual predicate as to relevancy and materiality to justify a review." *Id.*

In the present case, Defendant filed a "Supplemental Motion for Disclosure" seeking "Psychiatric or other medical records of [Victim]. Since 1998 to 2005." That motion provided in relevant part that "[i]t has been brought up in Court that [Victim] has cut on herself, and seeked [sic] help. Also a mental problem from fact or fiction, also has had problems in the past." During a pre-trial hearing on Defendant's motion, the State objected to Defendant's motion, but informed the court that it had provided Defendant all of Victim's psychiatric records, that it had in its possession. At that time, the trial court denied Defendant's motion, noting that it was overly broad, but stated that it would consider a more specific motion.

The issue was raised again at a later hearing, and the State again noted that it had disclosed all of Victim's records that were in the State's possession. Defendant argued at that hearing that he was entitled

to Victim's psychiatric records, so he could "see what type of person she really is" and that he believed "she ha[d] a problem." The trial court again denied Defendant's request for disclosure, noting that Defendant had failed to show materiality or relevancy.

At another motion hearing, Defendant requested an *in camera* inspection of Victim's psychiatric records, claiming that he believed records existed regarding Victim, but he did not know "in fact" whether they existed. The State argued that it did not believe that there were any psychiatric records to be disclosed. Defendant's request was again denied.

 Here, the State informed the trial court that it had provided Defendant with all the records it had in its possession. Defendant has never claimed otherwise.

> The State is obligated to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. The State has no obligation under the Due Process Clause to disclose information that it does not have. Nor does the State have the obligation to disclose evidence that it does not possess under Missouri's rules of discovery.

*State v. Stewart*, 18 S.W.3d 75, 92 (Mo. App. E.D.2000) (internal citations omitted). To the extent that Defendant is complaining that he was not provided with records outside of the State's possession, his point must fail.

In addition, we note that Defendant has never established the existence of any records that were not provided through discovery. At one of the pre-trial motions hearings, Defendant told the trial court that he believed there were records regarding Victim's psychiatric history, but he did not know "in fact" whether they existed. This distinguishes the present case from those relied on by Defendant: *Davis*,

186 S.W.3d 367, and *State v. Newton*, 925 S.W.2d 468 (Mo.App. E.D.1996).

In *Davis*, the defendant subpoenaed two treatment facilities and one physician, requesting the victim's counseling and psychiatric records. 186 S.W.3d at 371. In response to motions filed by the State and the Department of Mental Health, the trial court quashed the subpoenas. *Id.* On appeal, the defendant argued that the trial court erred in refusing to review *in camera* the victim's records. *Id.* The Court held that "[t]he trial court should have determined if the records were actually privileged before quashing the subpoenas." *Id.* at 372. Finding that the defendant had made the required showing as to both materiality and relevancy, the Court held that the victim's records should be reviewed *in camera* for relevancy and materiality after a determination of their privileged status. *Id.* at 372–73.

Similarly, in *Newton*, the defendant argued that the trial court erred in quashing his subpoena requesting the psychological records of a State's witness. 925 S.W.2d at 469. The defendant contended that the witness's psychological records contained vital impeachment evidence. *Id.* at 471. Recognizing that "[t]he generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal case," *Id.* at 471, the Court held that the trial court erred in quashing the defendant's subpoena and remanded the case to the trial court for an *in camera* inspection of the witness's records. *Id.* at 472.

In both *Davis* and *Newton*, the defendant subpoenaed an entity or person, requesting the records of a particular witness. In the present case, Defendant simply filed with the trial court a motion requesting the disclosure of Victim's psychological records. After reviewing the

record, we find no indication that Defendant subpoenaed any physician or health care facility seeking the production of Victim's records. If Defendant knew of the existence of records that were not provided through discovery and were not in the State's possession, he could have subpoenaed those records but failed to do so.[3] Because, the trial court in this case was never presented with a motion to quash a subpoena, we are not presented with the same scenario as the Courts in *Davis* and *Newton.*

Defendant does not dispute that the State turned over all records in its possession. Neither has Defendant shown that he subpoenaed any records that the State did not have in its possession which were subject to an *in camera* review. The trial court did not err in denying Defendant's motion for disclosure of Victim's psychiatric records. This point is denied.

 In Defendant's final point, he argues that the trial court plainly erred in failing to *sua sponte* intervene and declare a mistrial or issue a curative instruction when the State's witness, Dr. Patrick Connor ("Dr.Connor"), testified that it was his opinion that the history Victim gave him seemed credible. Defendant argues that Dr. Connor's testimony constituted an impermissible opinion of another witness's credibility, thereby depriving him of his rights to due process of law and to a fair trial before a fair and impartial jury. We disagree.

Dr. Connor, who examined Victim after the attack, testified as follows in response to the State's questioning:

Q: During your contact with [Victim], did you make any observations about her demeanor?

A: She was obviously emotionally distraught and she seemed to be, her

history was, seemed to be credible to me.

Defendant made no objection, and did not ask the trial court for any relief such as requesting a curative instruction, asking that the answer be stricken, or moving for a mistrial. Recognizing that his allegation of error is not preserved for appeal, Defendant requests that we review pursuant to Rule 30.20 to determine if the trial court's failure to act *sua sponte* amounted to plain error.

 Rule 30.20 provides, in pertinent part, that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." If in our discretion we decide to review for plain error, Defendant must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice would result if the error is left uncorrected. *State v. Taylor,* 166 S.W.3d 599, 604 (Mo.App. S.D.2005). Plain error is to be applied sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review. *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997). Finally, we observe that a trial judge should act *sua sponte* in the trial of a case only in exceptional circumstances. *State v. Thomas,* 965 S.W.2d 396, 401 (Mo. App. S.D.1998).

 "When determining the admissibility of opinion testimony, expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury." *State v. Churchill,* 98 S.W.3d 536, 538–39 (Mo. banc 2003). "When an expert witness tes-

3. *See* Rule 26.02(b).

tifies that a particular witness is telling the truth, prejudice often arises because the expert's testimony invests scientific cachet to an issue (credibility) that the jury is capable of determining without an expert's help." *State v. Price*, 165 S.W.3d 568, 572 (Mo.App. S.D.2005).

In arguing that the trial court plainly erred in this case, Defendant relies solely on *Churchill*, 98 S.W.3d at 538, in which an examining physician testified, over defendant's objection, that the sexual abuse described by the victim "was real." The Court reversed the defendant's conviction, in that case, holding that the testimony was "particularized," rather than a "generalization," and that the trial court committed reversible error by refusing to sustain the defendant's objection. *Id.* at 539.

*Churchill*, however, involved an erroneous evidentiary ruling, rather than a review for plain error. *State v. Thompson*, 985 S.W.2d 779 (Mo. banc 1999), on the other hand, did involve a review for plain error. There, the trial court sustained the defendant's objection to a question posed to the sheriff about whether it was his opinion that the defendant had feigned a memory loss. *Id.* at 788. Noting that the defendant requested no relief beyond making an objection, our Supreme Court held that the trial court did not err in failing to *sua sponte* declare a mistrial. *Id.* at 788.

Likewise, in *State v. Davenport*, 5 S.W.3d 547, 550 (Mo.App. E.D.1999), the defendant complained that the trial court failed to *sua sponte* declare a mistrial or instruct the jury to disregard a statement by the prosecutor during argument. The defendant's objection to the statement was sustained, but no further relief was requested. *Id.* The appellate court denied relief. *Id.*

Unlike *Churchill*, both *Thompson* and *Davenport* involved instances where the defendant's objection was properly sus-

tained. The appellate court in both cases found that there was no plain error in the trial court's failure to *sua sponte* grant further relief. In the present case, Defendant argues that the trial court committed plain error in failing to *sua sponte* grant a mistrial or issue a curative instruction, even where Defendant made no objection to Dr. Connor's statement.

The Supreme Court of Missouri, in *State v. Nolan*, 872 S.W.2d 99, 103 (Mo. banc 1994) (overruled on other grounds by *Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002)), stated:

> Manifest injustice or miscarriage of justice is not an easy phrase to define. Indeed the cases give the distinct impression that "plain error" is a concept appellate courts find impossible to define, save they know it when they see it. Whether an appellate court should take notice of an error not raised below must be made on the facts of the particular case, and there are no hard and fast classifications in either the application of the principle or the use of a descriptive title. (internal quotations and citations omitted).

In addition to the authorities cited above, there are factual considerations in this case that lead us to deny relief for plain error. First, Dr. Connor's comment was brief and was made without further elaboration. His comment was unsolicited, and there is no evidence that the State intentionally tried to inject this testimony into the case. "Unsolicited statements that are brief and limited in substance do not amount to reversible error in the absence of evidence that the prosecutor intentionally tried to inject unfair prejudice into the trial." *State v. Johnston*, 957 S.W.2d 734, 749 (Mo. banc 1997). Additionally, the jury was instructed that "you alone must decide upon the believability of

the witnesses and the weight and value of the evidence." Finally, there was no reference made to the comment during argument. In short, we are unable to discern that the trial court committed plain error under the applicable standards discussed above by failing to inject itself into the trial and take action that was not requested by Defendant. This point is denied.

The judgment of the trial court is affirmed.

BARNEY, and LYNCH, JJ., concur.