STATE of Missouri, Respondent,

v.

Anthony L. TABORN, Appellant.

No. WD 74745.

Missouri Court of Appeals, Western District.

Oct. 29, 2013.

Chris Koster, Attorney General, Todd T. Smith, Assistant Attorney General, Jefferson City, MO, for Respondent.

S. Kathleen (Kate) Webber, Assistant Appellate Defender, Kansas City, MO, for Appellant.

Before Division Three: KAREN KING MITCHELL, Presiding Judge, and LISA WHITE HARDWICK and GARY D. WITT, Judges.

KAREN KING MITCHELL, Presiding Judge.

Anthony Taborn appeals his convictions, following a jury trial, for the unclassified felony of forcible rape, two class A felonies of first-degree robbery and first-degree assault, one class B felony of first-degree assault, and three counts of the unclassified felony of armed criminal action.[1] After finding Taborn to be a prior felony offender, the court sentenced him to life imprisonment for the count of forcible rape and for each of the class A felonies, 25 years for the class B felony, and 100 years for each count of armed criminal action, with all sentences to run consecutively for a total of three life sentences plus 325 years. Taborn challenges the admission of evidence indicating that a witness saw him with a gun on a different occasion as well as the length of the sentence he received for the class B felony. The evidence Taborn challenges was properly admitted, but the 25–year sentence he received for the class B felony was outside the statutorily permitted range of punishment. Thus, we reverse Taborn's sentence on the class B felony of first-degree assault and remand for resentencing on that count only.

Taborn's remaining convictions and sentences are, in all other respects, affirmed.

## Factual Background[2]

On July 23, 2009, Taborn was hanging out with his friend, Taurean Burton, and Burton's girlfriend, Brittine Jones, at Jones's apartment. Taborn was wearing a black tank top and khaki shorts; his hair was in a ponytail. Burton was wearing a gray t-shirt and jean shorts; his hair was cut short, or "low." Between the two men, Burton was stockier and Taborn was skinnier.

Around 10:00 p.m. on July 23, 2009, Taborn contacted his cousin, Larry Brown (who was driving around with his brother Eugene Brown), and asked him to join Taborn and Burton at Jones's apartment.[3] Sometime after 10:30 p.m., Taborn and Burton told Jones "they were goin' to go peep something," meaning that they were "going to go watch someone to see if they could rob them or something."

Meanwhile, in a neighborhood across the highway from Jones's apartment, P.S. and her boyfriend, J.M., were spending the evening at J.M.'s home. Around 10:30 p.m., after having sex, the couple fell asleep, naked, on a futon mattress on the living room floor.

When Larry arrived at Jones's apartment, sometime between 11:45 p.m. and midnight, he picked up Taborn and Burton and drove them "around the corner" to a place very close to J.M.'s home. Larry parked his van; Taborn and Burton got

---

1. The distinction between class A and class B first-degree assault is based upon whether the victim suffered serious physical injury as a result of the assault. § 535.050.2. All statutory citations are to Missouri Revised Statutes 2000, as updated through the 2008 Cumulative Supplement, unless otherwise noted.

2. "We view the evidence and inferences in the light most favorable to the verdict, and disregard all contrary evidence and inferences." State v. Turner, 367 S.W.3d 183, 185 (Mo.App. S.D.2012).

3. Because Larry and Eugene Brown share the same last name, each will be referred to by first name only. No disrespect or familiarity is intended.

out while Larry and Eugene remained inside.

Around midnight, P.S. and J.M. were awakened by two strange men in their living room. Both men were at least six feet tall, wearing black bandanas over their faces, and carrying a handgun. One of the men (the stockier of the two who was wearing a white or light gray t-shirt) headed toward the couple's bedroom, while the other (the skinnier of the two who was wearing a black tank top and had his hair in a ponytail) struck P.S. in the head with what was later determined to be a .22 caliber semi-automatic handgun. At that point, J.M. looked at P.S. and said something about her bleeding, and then the skinnier man struck J.M. in the head with the same handgun.

The men repeatedly told P.S. and J.M. that the mob sent them to kill the couple and that the men wanted the money and the drugs. Neither P.S. nor J.M. had any connection to the mob and did not understand what the men were talking about. The men made the couple stand up against a wall and continued to demand money and drugs while threatening to kill the couple. The couple's dog growled and barked at the men, and the skinnier man warned them, "Shut that dog up or I'll kill him." Upon request, the men allowed J.M. to put the dog in a different room. When J.M. returned, the skinnier man made the couple lie face-down on the futon, and he tied both of their hands and J.M.'s feet with electrical cords. P.S. then felt something cold and hard, which she assumed to be the gun, running up the inside of her thigh, into her vagina. P.S. said, "No, please, stop," and J.M. told the skinnier man, "Leave her alone." The skinnier man responded by striking J.M. in the back of the head, knocking J.M. unconscious. J.M. was bleeding a lot, and P.S. believed he was dead. The skinnier man

assured P.S., "He's alright, ma'am. He's alright."

While P.S. was lying on the futon crying, the men rummaged throughout the home. She saw the stockier man unhook the wires and cables from the television and then step over the couple to take the television out the back door. At some point after that, the skinnier man made P.S. stand up, and he began walking her to the bedroom. Before they got to the bedroom, however, the skinnier man made P.S. bend over a chair. P.S. saw J.M. lying unconscious on the futon and considered trying to escape, but she overheard one of the men say something like, "Where are you at, what's taking so long?" Because she feared that there may have been a third person outside, she decided not to run.

The skinnier man led P.S. into the bedroom and made her lie down on the bed. He held a gun during the entire series of events. At some point, the man had untied P.S.'s hands, and he made her scoot to the edge of the bed and open her legs. P.S. advised the man that she was HIV positive, but he responded by saying, "We don't care about that." The skinnier man then raped P.S. When he was done, he told her to "stay there" and "wait until he goes," referring to the other man. The stockier man then entered the bedroom, asking, "Is it my turn?" The skinnier man left the room, and the stockier man raped P.S. When the stockier man finished, he left and the skinnier man reentered the room and made P.S. lie on her stomach; he then squirted dishwashing liquid all over her, rubbing it in, as if to clean her.

The skinnier man made P.S. stand up, and he again threatened to kill her if they found any drugs or money in the home. P.S. told him that all she had was her charm necklace, which the skinnier man tried to rip off her neck. P.S. begged him not to break it, and he agreed to let her

unclasp it. P.S. was too shaky, however, to undo the clasp, so the skinnier man set the gun down on the bed and attempted to undo it himself. P.S. grabbed the gun and moved a couple of steps away, pointed the gun at the man, and pulled the trigger. The gun did not discharge, so P.S. (who was unfamiliar with guns) frantically searched for a safety mechanism to turn off. Meanwhile, the skinnier man shouted, "The bitch got the gun," and then charged at her. P.S. held onto the gun "for dear life," because she feared that, if she let him have it back, he would kill her. The skinnier man kicked and punched P.S. until he finally managed to wrench the gun away from her. P.S. then cowered on the floor, crying and pleading for her life. The skinnier man made P.S. lie back down on the bed on her stomach. She thought he was going to shoot her in the head, but nothing happened.

Meanwhile, Larry grew tired of waiting in the van and began calling Taborn's cell phone. When Taborn did not answer, Larry started driving back towards Jones's apartment. Just as Larry and Eugene arrived back at Jones's apartment, Taborn called, asking, "Where you go, cousin, where you go?" and telling Larry, "Man, I'm ready, we ready, we ready." Larry and Eugene then drove back to the location where they had dropped off Taborn and Burton. After again waiting for a while, Larry and Eugene were getting ready to leave, but then Taborn and Burton jumped into the back of the van with a very large television. Following Taborn's directive, Larry quickly drove back to Jones's apartment.

Larry dropped Taborn and Burton off at Jones's apartment, and he and Eugene left. Taborn and Burton brought the following items inside Jones's apartment: a flat-screen television, an Xbox 360, a black duffel bag with two laptops inside, a purse with credit cards and identification inside, and "a few other miscellaneous things." Jones saw Burton carrying a gun. While Taborn and Burton were in the kitchen, Jones overheard Taborn saying "that he cannot stand white people ... because they always lie." Taborn said that "he had to knock somebody out or something like that," referring to a woman. More specifically, he indicated that "she lied and said she didn't have no money and that's why he knocked her out." Jones noticed that Taborn was bleeding from both his right leg and his right arm.

Back at J.M.'s home, after a few minutes of quiet, P.S. stood up and peered out of the bedroom. She did not see anyone, so she walked over to J.M. and found him regaining consciousness. After noticing that the two men were gone, P.S. untied J.M., and the couple searched for phones. They were unable to find any working phones, so they quickly put on some clothes and ran across the street to their neighbor's home, where they contacted the police. After the police arrived, both P.S. and J.M. were transported to the hospital.

At the hospital, P.S. was treated for a gash on her head, a fractured nose, two black eyes, and several minor cuts, bruises, and scratches, and underwent a sexual assault forensic examination, which revealed a sudsy substance inside her vagina. J.M. was treated for a fractured skull, a concussion, a gash on the head, a broken finger, and a broken rib.

The couple later discovered that the men had stolen two Lenovo laptops, a 40-inch flat-screen television, the remote control for a DVD player, a Sony Cybershot digital camera, a Sprint LG Lotus cellular phone, a Samsung slider cellular phone, seven credit cards, one debit card, a pocketbook, P.S.'s charm necklace, a duffel bag, an Olympus digital camera and carrying case, a Sony Xbox 360, a plastic container

full of loose change, and J.M.'s social security card.

The next day, Taborn called Larry, asking for a ride into the city. At Jones's apartment, Taborn offered to sell Larry a laptop. Taborn and Burton then loaded a television and other items into Larry's van. As they were driving into the city, Taborn directed Larry to stop at Hy–Vee, where Jones and Burton went inside to convert a large amount of change into bills. Taborn then directed Larry to go to Cash America pawn shop.

At Cash America, Taborn, Burton, Larry, and Eugene went inside with the television and the Xbox. The pawn shop refused to accept the television because the remote control did not match the television; they advised the men to "take [their] business somewhere else." Video surveillance showed Taborn, Burton, Larry, and Eugene at Cash America. After leaving Cash America, the group went to National Pawn, just up the street, where they successfully pawned the television and other items. Video surveillance also showed Taborn, Burton, Eugene, and Jones at National Pawn. Burton then told Larry to drive to Burton's mother's house.

When they arrived at the house, they parked and waited for someone to come out, but no one did. They then saw a Monte Carlo drive up and down the street. It stopped nearby, and police jumped out with guns drawn.[4] Taborn and Burton fled the van, but Larry, Eugene, and Jones remained and were taken into custody. A canine unit was called in, and the canine officer tracked down Burton within a mat-

ter of hours. Taborn was apprehended three days later and acknowledged that he was the individual in the pawn shop surveillance footage who was wearing a black tank top with his hair in a ponytail.

Two guns were recovered from inside Larry's van: a .22 caliber semi-automatic handgun and a .44 caliber revolver. Larry indicated that he had seen Taborn and Burton with those same guns the week before July 24, 2009. Subsequent DNA testing linked both guns to Taborn, Burton, P.S., and J.M.

The State charged Taborn, as a prior felony offender,[5] with one count of forcible rape (unclassified felony), one count of first-degree robbery (class A felony), one count of first-degree assault with serious physical injury (class A felony), one count of first-degree assault without serious physical injury (class B felony), and three counts of armed criminal action (unclassified felony). While in jail, Taborn contacted his girlfriend, asking her to be an alibi for the night of July 23, 2009, but she refused.

Taborn testified that he had been asleep at Jones's apartment during the home invasion and knew nothing of it until he was awakened by Burton and Larry entering Jones's apartment with a large television and a duffel bag. Taborn also testified that Burton admitted raping P.S. and robbing the home. Taborn admitted pawning the items taken during the robbery and handling the gun while inside Larry's van. He further admitted that, after being apprehended, he initially told police that he

---

4. The police had been able to locate the van by pinging the cellular phone signals from P.S. and J.M.'s cellular phones, which Burton and Taborn had been using.

5. During trial, before the case was submitted to the jury and outside its presence, the State offered a certified copy of Taborn's prior conviction for second-degree assault of a law enforcement officer. The court received the exhibit and found Taborn to be a prior felony offender.

had been with his girlfriend all night and denied being at any pawn shops.

The jury found Taborn guilty on all counts. At the sentencing hearing, the State requested a total sentence of 1,200 years, which included thirty years for the class B felony of first-degree assault. In making the request, the State noted that Taborn "was enhanced as a prior *and persistent* offender because of his prior sentences." (Emphasis added.) When announcing sentence, the court addressed the class B felony and noted that Taborn "was found to be a prior *and persistent* offender by his prior convictions"; the court then verified its statement with defense counsel, who agreed. (Emphasis added.) The court pronounced sentence on the class B felony of first-degree assault at twenty-five year' imprisonment. The court sentenced Taborn to consecutive terms of life imprisonment for rape, robbery, and class A felony first-degree assault, and 100 years for each count of armed criminal action, for a total of three consecutive life sentences plus 325 years. Taborn appeals.

## Standard of Review

 Taborn claims that the trial court erred in both admitting alleged propensity evidence and sentencing him outside the statutorily authorized range of punishment for the class B felony of first-degree assault. He made no objection, however, to either action below.[6] Thus, he failed to preserve these claims, and we review them, if at all, for plain error only. Rule 30.20.[7] "The plain error rule should be used sparingly and does not justify a re-

---

6. Taborn did request a mistrial based upon the alleged propensity evidence, but not at the time the evidence was introduced. Instead, he made the request at the first recess following admission of the evidence. " 'To properly preserve a challenge to the admission of evidence, the objecting party must make a specific objection to the evidence at the time of

view of every alleged trial error that has not been properly preserved for appellate review." *State v. Cochran*, 365 S.W.3d 628, 633 (Mo.App. W.D.2012). In determining whether to grant plain error review, we first determine whether, on the face of the appellant's claim, "the trial court committed error that is evident, obvious, and clear." *Id.* If we find such error, we then move to the second step of determining whether that error "resulted in manifest injustice or a miscarriage of justice." *Id.*

## Analysis

Taborn first argues that the trial court erred in admitting evidence that Eugene Brown, after being arrested and asked whether Taborn and Burton had handguns, told detectives, "They might have had some and did something and I seen them earlier before that week." Taborn argues that Eugene's statement constituted improper propensity evidence. In his second point, Taborn argues that the trial court erroneously sentenced him outside the statutory range of punishment permissible for class B felonies when it sentenced him to twenty-five years for first-degree assault. We reject his first point, but find merit in the second.

**A. The trial court committed no error, plain or otherwise, in admitting evidence that Taborn may have been seen with a gun before the date the crimes were committed.**

its attempted admission.' " *State v. Cochran*, 365 S.W.3d 628, 632–33 (Mo.App. W.D.2012) (quoting *State v. Mickle*, 164 S.W.3d 33, 55 (Mo.App. W.D.2005)).

7. All rule references are to the Missouri Supreme Court Rules (2013), unless otherwise noted.

During Eugene's direct examination, the prosecutor asked several questions about Eugene's statement to police following his arrest:

Q. Can you recall whether or not you told the detectives whether or not [Taborn and Burton] had handguns?

A. Yes, I remember.

Q. And what did you tell the detectives about handguns?

A. *They might have had some and did something and I seen them earlier before that week.*

(Emphasis added.) Taborn argues that Eugene's statement about the handguns constituted impermissible propensity evidence that prejudiced his defense. We disagree.

"The 'well-established general rule' concerning the admission of evidence of prior criminal acts 'is that proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial.' " *State v. Vorhees*, 248 S.W.3d 585, 587 (Mo. banc 2008) (quoting *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954)). "The rationale underlying this rule is grounded in the view that '[e]vidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted.' " *Id.* (quoting *State v. Sladek*, 835 S.W.2d 308, 311 (Mo. banc 1992)). "This right arises from the guarantee of article I, sections 17 and 18(a) of the Missouri Constitution that a defendant has the right to be tried only on the offense charged." *Id.* at 587–88.

"[V]ague or speculative references to Appellant's involvement in other crimes[, however,] do not violate this right." *State v. Lutz*, 334 S.W.3d 157, 162 (Mo.App. S.D.2011). " 'To violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other crimes or misconduct.' " *Id.* (quoting *State v. Price*, 165 S.W.3d 568, 576 (Mo.App. S.D.2005)). " 'Vague references are not characterized as clear evidence associating a defendant with other crimes.' " *Id.* (quoting *Price*, 165 S.W.3d at 576).

Here, Eugene's statement that Taborn and Burton "might have had some and did something" and that he had "seen them earlier before that week" is the epitome of vagueness. First, Eugene never identified what the "something" is that Taborn and Burton *might* have done with the guns they *might* have had; thus, his statement in no way definitely associated Taborn with another crime.[8] And, second, it is unclear whether the "them" that Eugene had seen earlier referred to handguns or Taborn and Burton. Furthermore, we are required to view all evidence and inferences in the light most favorable to the verdict. *State v. Turner*, 367 S.W.3d 183, 185 (Mo.App. S.D.2012). When viewed from this perspective, it appears that Eugene's testimony referred to Taborn and Burton's involvement in the *charged crimes*, given that the question asked was related to what Eugene told the investigating detectives about his knowledge of the *charged crimes*.

Because the evidence did not definitely associate Taborn with any prior crimes

---

8. Although, as a felon, it was unlawful for Taborn to possess a firearm, § 571.070.1(1), the jury was never apprised of Taborn's status as a prior felon. Absent this information, there was no basis for the jury to conclude that Taborn's prior possession of a firearm, in and of itself, constituted a criminal act.

and only vaguely associated him with the charged crimes, the trial court committed no error in admitting Eugene's testimony. In the absence of error, we do not reach the question of whether Taborn suffered a manifest injustice from the admission of this evidence.

Point I is denied.

**B. The trial court plainly erred in sentencing Taborn outside the statutorily permissible range of punishment for a class B felony.**

■ In his second point, Taborn argues that the trial court plainly erred in sentencing him to twenty-five years for a class B felony. We agree.

■ "The authorized term[ ] of imprisonment ... [f]or a class B felony[ is] a term of years not less than five years and not to exceed fifteen years...." § 558.011.1(2). The court sentenced Taborn to twenty-five years based upon the court's belief that Taborn was a *prior and persistent* felony offender. "A 'persistent offender' is one who has pleaded guilty to or has been found guilty of two or more felonies committed at different times." § 558.016.3. Before one can be adjudged a persistent offender, the State must plead and prove the facts necessary to warrant the finding and the court must enter a specific finding that the defendant is, in fact, a persistent offender. § 558.021.1(1)–(3).

■ Here, the State concedes that it neither pled nor proved Taborn to be a persistent offender. Instead, the State pled and proved—and the trial court found—Taborn to be a *prior* offender. "A 'prior offender' is one who has pleaded guilty to or has been found guilty of one

felony." § 558.016.2. The distinction between a prior offender and a persistent offender is important because, while a finding of either removes sentencing from the jury, only a finding of persistent offender status allows the court to extend the maximum term of punishment. *State v. Emery*, 95 S.W.3d 98, 100 (Mo. banc 2003); § 558.016.7 (stating that the maximum term of imprisonment for a persistent offender convicted of a class B felony is "any sentence authorized for a class A felony").

Here, while the sentence would have been authorized had the State actually pled and proved Taborn to be a persistent offender, the State did not do so. Thus, the maximum authorized term of imprisonment on the class B felony was "a term of years ... not to exceed fifteen years." § 558.011.1(2). Taborn's sentence of twenty-five years was plainly outside the statutorily permissible range.

■ "Being sentenced to a punishment greater than the maximum sentence for an offense constitutes plain error resulting in manifest injustice." *State v. Severe*, 307 S.W.3d 640, 642 (Mo. banc 2010). " 'A defendant cannot by waiver confer jurisdiction on the court to impose a sentence not authorized by law.' " *State v. Starnes*, 318 S.W.3d 208, 216 (Mo.App. W.D.2010) (quoting *State v. Prell*, 35 S.W.3d 447, 450 (Mo.App. W.D.2000)). Thus, we reverse Taborn's sentence on the class B felony of first-degree assault conviction and remand for resentencing on that conviction only.[9]

Point II is granted.

9. Taborn urges a remand for resentencing on *all* counts, but we see no reason to allow resentencing on the other counts, as it is plain from the transcript that the court's error affected only the sentence at issue in this appeal. After resentencing, the trial court should ensure that only the prior offender box is marked on the sentence and judgment.

## Conclusion

The trial court committed no error in admitting evidence that Taborn might have had a gun and done "something," as this evidence did not constitute impermissible propensity evidence. The trial court did err, however, in sentencing Taborn in excess of the statutorily permissible range of punishment for a class B felony. The sentence on Count VI (class B felony first-degree assault) is reversed and remanded for resentencing on that count only. Taborn's convictions and sentences are, in all other respects, affirmed.

LISA WHITE HARDWICK and GARY D. WITT, Judges, concur.