**STATE of Missouri, Respondent,**

v.

**Rahman A. WHITAKER, Appellant.**

**No. ED 98531.**

Missouri Court of Appeals,
Eastern District,
Division One.

June 18, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 31, 2013.

Ron Ribaudo, Clayton, MO, for appellant.

Chris Koster, Timothy A. Blackwell, Jefferson City, MO, for respondent.

CLIFFORD H. AHRENS, Presiding Judge.

Rahman Whitaker ("Defendant") appeals from the judgment of the trial court entered after a jury convicted him of domestic assault in the second degree, forcible sodomy, and armed criminal action. Finding no error, we affirm.

Defendant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the judgment, the facts are as follows. Defendant and A.V. were involved in a romantic relationship and lived together in A.V.'s apartment for approximately six years. In early May 2011, A.V. told Defendant that she wanted to terminate the relationship. They agreed to stay in the apartment together until the end of the month. A.V. left the apartment after Defendant choked her "severely" and temporarily moved in with her parents. A.V. did not report this incident to the police. They spoke over the phone to address various issues, and A.V.'s father got the keys to the apartment from Defendant while she waited in the car because she was afraid of Defendant and did not trust him. She bought a gun to protect herself, and moved to a new apartment. A.V. did not tell Defendant the location of her new apartment, but even before she left the old apartment he showed her photos of the inside of the new apartment, which frightened her.

In the early hours of June 22, 2011, A.V. woke up when the alarm to the apartment went off, and she saw Defendant standing at the top of the stairs. She screamed. Defendant told her to "shut the fuck up," and choked her. He made her shut off the alarm, and said "Why are you making me do this?" He took a knife from the kitchen and threatened to cut her face, and poked her with it. When asked, he told A.V. that he was wearing black gloves so he would not leave any fingerprints when he killed her, and could leave. Defendant told A.V. that he wanted her new boyfriend's belongings out of the apartment.

Defendant said "Let's make love." He put down the knife and took off his clothes. Feeling threatened by Defendant and the knife, she performed oral sex on him to get him to leave the apartment. Defendant asked A.V. if she wanted sex, but she declined. He gave her a key to the apartment, although she had not given him one. They kissed and hugged and said they loved each other. He asked her if she was going to tell the police, and she told him that she had not done so in the past, and would not do so now. A.V. did these things to get Defendant to leave her home.

After Defendant finally left, A.V. got dressed. A.V. worked for her stepfather, and went to his office to tell him what happened, and then she went to the police. A.V. was interviewed at the police station, and that interview was recorded. Later that same day, A.V. got an order of protection from the court.

Detective Carrie Brandt contacted Defendant and advised him that the police wanted to talk with him. He was interviewed at the police station on June 23, 2011, which was recorded, and gave the police a written statement. In the statement, Defendant wrote that:

> I went to her house to scare her, make her think I was going to do something, but there was no intent to harm her in any fashion. We talk about out current situation. I ask what was going on with the bags in her room. She said they belonged to her friend.

I asked if her friend was moving in. She said do [sic]. I ask why are we playing with each other feeling [sic] and why I the one that has to find out on his own.

She said there was nothing going [sic] and that her friend was leaving this weekend.

We talked about what we did for the weekend, then we went downstairs to get a drink of water. There was a knife on the counter. I picked it up and said, "Are you going to stab me with this?" and then I said, "I should cut your face so nobody else loves you."

She said "Give me the knife." She took the knife and we continued to talk. Then she said Stevie was coming over to do some housework, so I was about to leave. Then we hugged, and I said to her, "See, I told you nothing was going to happen."

I don't know why she felt that way. She knows I'm not going to try to harm her in any way. I told her how much I miss her and she said that she feels the same. She started to rub my chest and play with my hair, and I told her how much I still loved her and wish we would stop acting like this and do what's right.

We hugged some more and I said to her, "You still make me feel good about myself." I told her how she excited me and I missed making love to her and holding her. She said, "We can make out, but it has to be quick." We went upstairs for a while, then I left.

Defendant's version of events as recounted in the interview differed sharply from that of A.V. He stated that he helped her move into her new apartment and that she knew that he had a key. He averred that A.V. had been calling him every day and talking for hours. He said that he did not coerce or threaten her into performing oral sex on him, but rather that she suggested it. He denied having any weapon when he was at A.V.'s apartment. Defendant repeatedly stated that he was just trying to scare A.V., like playing a game with her, and that he had "no ill intent," or "any criminal intent[.]"

The State charged Defendant with burglary in the first degree ("Count I"), domestic assault in the second degree ("Count II"), forcible sodomy ("Count III"), and armed criminal action ("Count IV"). Defense counsel filed a motion in limine seeking to prevent the State from presenting evidence of prior uncharged misconduct, including evidence that on separate dates in May 2011 Defendant had choked A.V. The trial court made an interlocutory grant of the motion, to an extent, stating that it was not going to let the two prior choking incidents come in as prior bad acts, but that it was leaving the door open for the State to argue "the motivation involved" and let the State "get into it somewhat as to an explanation of why they're not living together and the reason why without the detail." The following day the trial court modified its interlocutory ruling on the motion, stating that it was going to exclude some of it and allow some of it "pursuant to our agreement."[1] The State indicated that it had instructed A.V. regarding this ruling and her testimony.

In its opening statement, the State discussed Defendant's breakup with A.V. and his bad reaction to it, and stated that he became violent with her and choked her on one occasion in May 2011 to the point of unconsciousness. The State then said that

---

1. The agreement apparently was off the record, but it appears that the trial court granted the motion in limine to exclude one of the two choking incidents in May 2011, but permitted the State to introduce evidence of the other choking incident in May 2011.

A.V. would testify that she moved in with her mother after the choking incident and had only limited communication with Defendant. Defense counsel objected to the State's reference to that particular choking incident, which was supposed to be excluded, and moved for a mistrial. The State argued that the trial court had said that it would permit evidence of one choking incident. The trial court indicated that it was not aware that A.V. passed out during one of the two choking incidents in May 2011, and stated that it would permit evidence that there was one prior choking incident, and overruled defense counsel's motion for a mistrial, save that there was to be no mention about A.V. passing out. The trial court advised defense counsel that the trial should just proceed, and thereby minimize the issue rather than emphasize it by sustaining an objection on the record. It also stated that it would not strike the State's remarks, and that things should just "move on[.]" The State continued its argument stating that A.V. was fearful of Defendant because of a prior choking incident in May 2011, just prior to moving out.

A.V.'s stepfather, who was also her employer, testified, as did A.V. and several police detectives of the Chesterfield Police Department. Defendant testified as well. The State entered a number of exhibits into evidence, including photos, the knife, a DVD of Defendant's interview, and his written statement to the police. Defense counsel objected when the State asked to play the DVD to the jury, "pursuant to the previously filed motion to suppress." The trial court overruled the objection.[2]

The jury convicted Defendant on Counts II, III, and IV, and acquitted him on Count I, burglary in the first degree. The trial court sentenced Defendant to terms of imprisonment of one year in the county jail for Count II, twenty-five years for Count III in the Missouri Department of Corrections, to run consecutively to the sentence for Count II, and to twenty-five years for Count IV, to be served concurrently with the sentence for Counts II and III.

Defendant now appeals from this judgment.

■ In his first point relied on Defendant contends that the trial court erred by permitting the State to introduce evidence that he had choked A.V. in May 2011 because this was inadmissible evidence in that "the evidence was verboten propensity evidence," which even if otherwise admissible, was "clearly more prejudicial than probative."

■ We note initially that this claim of error was not properly preserved. Defense counsel filed a motion in limine to exclude evidence of prior uncharged misconduct, which included the two choking incidents in May 2011. Defendant also included the issue in his motion for a new trial. However, while Defendant objected when the State sought to play the DVD of his interview to the jury on the basis of the motion to suppress, he did not object to A.V.'s testimony about one of the choking incidents in May 2011. When a pretrial motion to suppress evidence is denied, in order to preserve the issue for appellate review the defendant must renew the objection or make a specific objection at trial when the evidence is presented. *State v. Baldwin*, 290 S.W.3d 139, 144 (Mo.App. 2009) (quoting *State v. Jordan*, 978 S.W.2d 36, 40 (Mo.App.1998)). Accordingly, we can only review for plain error. Rule 30.20; *State v. Edwards*, 280 S.W.3d 184, 188 (Mo.App.2009). Plain error occurs only when the claimed error establishes

---

**2.** The trial court overruled the objection after ascertaining that it was redacted in accordance with its ruling on the motion to suppress.

substantial grounds for believing that a manifest injustice or a miscarriage of justice has resulted therefrom. *Id.* Plain error review should be used sparingly, and an appellate court has complete discretion whether or not to review an unpreserved matter for possible plain error. *Id.* Here, where Defendant has not requested that this Court review the matter under plain error review, we could decline to do so *sua sponte. See id.* However, we will determine whether plain error review is appropriate in this case.

 Under Rule 30.20, plain error review involves a two-step process. *State v. Smallwood*, 230 S.W.3d 662, 664 (Mo.App. 2007). First, we determine whether plain error has occurred, that is, whether the claim for review facially demonstrates substantial grounds for believing that a manifest injustice or a miscarriage of justice has resulted. *Id.* If this Court finds plain error on the face of the claim for review, we have discretion to proceed to the next step of the process: the determination of whether the claimed error actually resulted in a manifest injustice or miscarriage of justice. *Id.* Manifest injustice depends on the facts and circumstances of the particular case. *Id.* Plain error can serve as the basis for granting a new trial only if the error had a decisive effect, i.e., it was outcome-determinative. *State v. Bartlik*, 363 S.W.3d at 391 (Mo.App.2012). The defendant has the burden of establishing that plain error has occurred that resulted in manifest injustice or a miscarriage of justice. *Id.*

 Evidence of prior uncharged bad acts is inadmissible for the sole purpose of showing the defendant's propensity to commit such acts. *State v. Miller*, 372 S.W.3d 455, 473 (Mo. banc 2012) (quoting *State v. Gilyard*, 979 S.W.2d 138, 140 (Mo. banc 1998)). However, evidence of uncharged misconduct is admissible for alternative purposes such as establishing mo-

tive, intent, absence of mistake or accident, a common plan or scheme, or the identity of the defendant on trial. *Id.* at 473–74 (quoting *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011)). Evidence of uncharged crimes that are part of the sequence of events or circumstances surrounding the charged offense may also be admissible to present a complete, coherent picture of the overall events. *Id.* at 474. In cases involving adult abuse, a defendant's history of violent or threatening conduct towards the same victim " 'can be especially probative.' " *State v. Stewart*, 343 S.W.3d 373, 379 (Mo.App.2011) (quoting *State v. Andrich*, 943 S.W.2d 841, 844 (Mo.App.1997)).

Defendant cites *State v. Tolliver*, 101 S.W.3d 313, 315 (Mo.App.2002) for the proposition that evidence of prior bad acts to show motive, intent, or the absence of mistake or accident is admissible for such purposes only if the defendant puts motive, intent, mistake or accident at issue. He also cites that case for the proposition that proof of a criminal act ordinarily gives rise to an inference of the required mens rea and that no other evidence is needed to show that element, unless the State has reason to believe that the defendant will make motive, intent, mistake, or accident an issue. *Id.* at 316. Defendant argues that he did not place intent at issue in his statements to police. We disagree.

In his interview with the Chesterfield Police, Defendant repeatedly stated he had no criminal intent, but rather that he only meant to scare A.V. and that he had no intent to hurt her. His statements to the police that he had no bad intent, along with his version of events that sharply conflicted with those of A.V., gave the State reason to believe that he planned to make intent an issue. We also note that the prior choking incident in May 2011 was one of the principal motivations for A.V. moving out of her old apartment and

breaking up with Defendant, and helped to provide a complete and coherent portrait of the events in the relationship between Defendant and A.V. The trial court did not err, plainly or otherwise, in admitting the evidence of the May 2011 choking. Point denied.

In his second point relied on Defendant argues that the trial court plainly erred by overruling his objection to "the expert witness testimony of Detective [Christopher] Pollman," because that testimony invaded the province of the jury in that he stated that Defendant "was lying when he denied committing the charged crimes, that the requisite intent for burglary was easy to establish, and that, in fact, [Defendant] had the requisite intent to be convicted of burglary."

Defendant concedes that this claim of error was not preserved because no objection was made to the testimony at issue and requests plain error review by this Court. As previously stated, plain error review is a two-step process. *Smallwood*, 230 S.W.3d at 664. Initially this Court determines whether plain error has occurred, that is, whether the claim for review facially demonstrates substantial grounds for believing that a manifest injustice or a miscarriage of justice has resulted. *Id.* If we find plain error on the face of the claim for review, we have discretion to proceed to the next step of the process, that is, determining whether the claimed error actually resulted in a manifest injustice or miscarriage of justice. *Id.*

We note initially that Defendant argues that Detective Pollman testified as an expert witness who stated that Defendant was lying. Nowhere in the record is there any indication that the State offered Detective Pollman as an expert or that he testified as such. He simply testified about his role in the investigation, including his interview of Defendant and about Defendant's written statement to the police. He testified about how the interview was conducted, and noted that some of Defendant's statements did not match up to the physical evidence, such as the location of the knife involved in the incident, or were inconsistent with each other, such as whether or not A.V. knew that he had a key to her new apartment.

There was no manifest injustice or miscarriage of justice. Detective Pollman's testimony did not invade the province of the jury and was not outcome-determinative. He did not make any legal conclusions, but rather testified about facts. A.V. testified about the location of the knife, and photographs of the scene showed that it was found upstairs on the banister railing as she testified, not downstairs in the kitchen as Defendant stated. The jury saw the recorded interview of Defendant in which he wavered back and forth regarding whether or not A.V. knew that he had a key. Point denied.

In his third point relied on Defendant avers that the trial court erred by sustaining the State's objection to evidence proffered by Defendant of two portions of a video-recorded statement by A.V. in which she was "laughing" when the police asked her about what she was wearing on June 22, 2011 and when the police mentioned oral sex with him. Defendant asserts that such evidence was legally and logically relevant in that it was proper impeachment evidence and proper substantive evidence of A.V.'s demeanor.

We review a trial court's decision to admit or to exclude evidence for abuse of discretion. *State v. Smoot*, 363 S.W.3d 108, 110 (Mo.App.2011). The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances before it and is so unreasonable and arbitrary as to indicate a lack of careful consideration. *Id.* In addition, we review the trial court's decision for prejudice, not mere error, and we will reverse

only if the error is prejudicial that it deprived the defendant of a fair trial. *Id.* (quoting *State v. McKinney,* 336 S.W.3d 499, 502 (Mo.App.2011)).

Assuming *arguendo* that the trial court abused its discretion in excluding the two portions of the video-recorded interview of A.V. in which she was "laughing," Defendant was not prejudiced thereby. On cross-examination A.V. testified that she did not know if she laughed in her interview with the police, but that she smiles and laughs when she is nervous or has high anxiety. When asked if she would not have laughed when asked about performing oral sex on Defendant, A.V. replied that she would not have done so "unless I was highly nervous." Officer Damon Webb, called as a witness for the defense, testified that when he spoke with A.V. that she was obviously very upset and at times tearful. When asked by defense counsel if he would be shocked if A.V. were laughing on the video of the interview, Officer Webb responded in the negative. He explained that victims whom the police interview often laugh nervously when others might think it inappropriate, and stated that he might have heard A.V. chuckle "once or twice." He also said that he was not in the interview room with A.V. for the entire interview, and so did not know how much she had laughed. Detective Brandt was also called as a witness for the defense. She testified that there had been a problem with the recording equipment when she was interviewing A.V., so that not all of the interview was preserved. Detective Brandt said that A.V. got "choked up" at times during that part of the interview that was not recorded, but that she did not cry. She said that A.V. was upset when discussing performing oral sex on Defendant, as her boyfriend was present during the interview. Detective Brandt initially testified that A.V. did not laugh, but upon further questioning, stated that she did laugh a few times as a result of her ner-

vousness. She stated that A.V. "could have been laughing" when talking about Defendant ejaculating into her mouth, and that A.V. did laugh when telling her that she had been wearing pink capri pajamas and a v-neck shirt during the incident. The jury was aware that A.V. laughed during her interview with the police while discussing a serious and frightening matter, and she admitted that she smiles and laughs when she is nervous or anxious. Officer Webb testified that while such laughter would seem inappropriate to outside observers, that it was common in police interviews of victims who had been in stressful situations. There is no reasonable probability that the outcome of the case would have been different if the video clips of A.V. laughing had been admitted into evidence. Point denied.

The judgment of the trial court is affirmed.

SHERRI B. SULLIVAN, and GLENN A. NORTON, JJ., concur.