

# Missouri Court of Appeals

## Southern District

## Division One

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
vs. ) No. SD36727
)
JORDAN BUSH, ) **Filed: August 27, 2021**
)
    Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Mark A. Powell, Associate Circuit Judge

## **<u>AFFIRMED</u>**

Appellant Jordan Bush ("Bush") appeals his convictions, following a jury trial, of one count of second-degree domestic assault; eight counts of third-degree domestic assault; three counts of fourth-degree domestic assault; and one count each of second-degree burglary, attempted tampering with a victim, first-degree property damage, and first-degree harassment. In two points on appeal, Bush argues: (1) the trial court's decision to overrule his motion for a mistrial was an abuse of discretion; and (2) the trial court's admission of certain propensity evidence was plain error. Finding no merit in either of Bush's contentions we deny the same and affirm the judgment.

1

**Factual and Procedural History**

Between late 2018 through early 2019 Bush would visit his girlfriend ("Victim") and stay with her for a few days at a time.[1] In 2019, Bush was arrested for a series of domestic disputes between himself and Victim. On the evening of March 17, 2019, a physical altercation broke out where Bush threw a cup of juice in Victim's face; pulled her hair; choked her; slapped her; whipped her with a phone cord; stabbed her and cut her hair with a pair of beard scissors;[2] and eventually poured bleach over her and her home. She responded by grabbing his dreadlocks, trying to push him away, and scratching him. The altercation eventually ended with Bush and Victim becoming tired and going to sleep around 2:00 or 3:00 a.m. the next morning. Between 6:00 and 7:00 a.m., Victim woke up and another dispute arose because she would not unlock her phone for Bush. He then pushed Victim, struck her with his hand, and poured water all over her and her apartment. Victim was able to leave her apartment and asked a neighbor to call the police while she waited in her car. When the police responded they could not locate Bush in the apartment; however, when they were called back a little later (after Bush called Victim) they found Bush hiding in a closet. When asked about the incident, Bush claimed he did not choke[3] Victim and if any injuries occurred they were unintentional, but he otherwise confirmed the events of the night.

On May 9, the couple had another dispute. They went to a club together then left for Victim's apartment. On the ride home, Bush was yelling at Victim, saying she was

---

[1] Bush testified that sometimes he stayed with Victim "a week or more" and claimed that he was "somewhat living with" Victim, but Victim testified they did not live together.

[2] Victim described the beard scissors as being one to two inches long, used by men for grooming.

[3] He was asked if he "intentionally choked her" to which he replied "no."

no fun because she "didn't want to go out and party" and because she did not drink. After returning to Victim's apartment Bush continued to ask about going back to the club. Victim decided she would drive him back; however, once they arrived in the parking lot, Bush was yelling more and Victim decided "his behavior wasn't appropriate to go back inside, to be around other people" so she drove them both back to her apartment again. When they returned to Victim's apartment, the argument continued until Bush began yelling and throwing things. Victim tried to call a friend but Bush took her phone. When Victim tried to leave the apartment through the front door to go knock on a neighbor's door Bush pulled her back inside by her hair to stop her. Victim eventually exited her living room through a sliding glass door to the porch and jumped off her second-floor balcony, then drove to a nearby gas station to call police. Police officers met with Victim at the gas station, took photographs of her injuries, and returned to her apartment with her. When they arrived at Victim's apartment, Bush was no longer there. A police officer took photographs of Victim's apartment and then left. Victim barricaded her door and went to bed. During the night Bush repeatedly called Victim and at one point he tried to force his way into the apartment. Victim again called the police, who responded, recorded evidence of the damaged door, and advised Victim to stay somewhere else that night.

For the next few weeks Bush texted Victim between 200-300 times per day and called her 500 times or more per day, and he often spoofed his number[4] to harass her. During a conversation at Victim's apartment on May 31, Bush insisted that Victim go to the police to drop all the charges against him and threatened to send a compromising

---

[4] Spoofing in this case meant Bush used a phone application to conceal his telephone number and to deliver messages from random numbers instead of his own.

3

photograph to Victim's friends, family, employer, and housing manager if she did not do so. Victim pretended she was going to drop the charges, but instead went to the courthouse to report that she was in fear for her safety and wanted to turn Bush in on several outstanding warrants. She told police that Bush was at her apartment and they went to look for him. While making her report she received between 10-15 calls and 5-10 texts from Bush, including the compromising photograph that he threatened to release and other texts threatening her and calling her a snitch. After work two days later, Victim found her apartment ransacked – everything was turned over, furniture and clothes were in disarray, the door frame was shattered with trim on the floor, it smelled like bleach and there were bleach stains on her carpet, furniture, and clothing. She testified that there was between $5,000 and $8,000[5] worth of damage to her apartment and possessions. Bush admitted to much of the incident between himself and Victim, but insisted he never meant to hurt her and had a right to enter Victim's apartment.

Prior to trial, Bush made a motion in limine to limit evidence regarding prior misconduct or bad acts. During the motion hearing Bush's counsel explained that they were objecting to any reference to "anything other than his past conviction." Defense counsel asked the court to "limit . . . what information from that charge can be brought in" and questioned whether "we even need to discuss that it involves [Victim]." The prosecutor argued that she wanted Victim to testify "about what happened in [the September 2017 incident], and where there was abuse" for the purpose of showing "intent, motive, and just a history of animus towards the victim." The trial court overruled Bush's motion in limine.

---

[5] Victim turned in a claim for $6,000 and received approximately $3,000 from the insurance company.

4

At trial Victim testified about her previous relationship with Bush while she attended college in September 2017.[6] While she was a student living on campus he visited her and, on at least one occasion, threw a phone at her, choked her, and hit her. During this same time period, Bush also sent her numerous texts threatening to hurt or kill her. The prosecutor then introduced copies of some of those texts reading: "Sendin the cops. Imma kill u"; "Count ya days down cuz u wont live to see next year or Christmas ho ho ho"; "Imma kill u bitch now go tell that since u like to snitch"; "Snitches get killed & u goin 6 feet under snitch ass ho." Bush's counsel did not object to the introduction of the texts, photos of Victim's injuries,[7] or object to the introduction of her testimony.

During *voir dire*, the bailiff directed the court's attention to Bush's restraints, indicating that, although Bush was wearing dress clothes, a belt from his knee restraints hung down just a little below his pant leg. Bush's counsel noted that the empaneled jurors would have to pass by Bush to leave the courtroom and so there was a possibility that they might see the belt from the restraints. The prosecutor argued that the device was a black band that was almost invisible against Bush's black pants and black shoes, the jury would be walking by where it would be on Bush's outer side and not visible, and that most people, including herself, would not know that it was there, which would suggest there was no prejudice. Bush's counsel requested a mistrial but was overruled.

---

[6] Victim and Bush initially started dating in the fall of 2016.

[7] When the prosecutor sought to admit the photograph of Victim's injuries (Exhibit 87), defense counsel asked, "Your Honor, before I answer without an objection, may I voir dire the witness, [Victim]?" The court allowed defense counsel to do so, a brief inquiry was held, then the exhibit was admitted without objection.

The court noted that though he could see the belt from the knee restraints it was not obvious and "you'd have to be looking for it."

Following the jury verdict, Bush filed a timely motion for new trial. The trial court overruled the motion and this appeal followed.

**Discussion**

*Point I: Visibility of Restraints and Denial of Mistrial Motion*

"The decision to declare a mistrial is within the discretion of the trial court because it is in the best position to determine whether the alleged incident had a prejudicial effect on the jury." **State v. Jensen**, 524 S.W.3d 33, 41 (Mo. banc 2017). "A trial court abuses its discretion to grant a mistrial only if 'its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration.'" **State v. Blurton**, 484 S.W.3d 758, 779 (Mo. banc 2016) (quoting **State v. Ward**, 242 S.W.3d 698, 704 (Mo. banc 2008)).

Bush's first point argues that the trial court abused its discretion by denying his request for a mistrial because appearing in restraints made him appear to be dangerous and destroyed the presumption of his innocence. "A defendant cannot routinely be visually shackled in the guilt or penalty phase of a criminal trial '*unless* that use is justified by an essential state interest—such as the interest in courtroom security—specific to the defendant on trial.'" **State v. Taylor**, 298 S.W.3d 482, 512 (Mo. banc 2009) (quoting **Deck v. Missouri**, 544 U.S. 622, 624 (2005) (emphasis in original and internal quotations omitted)). "'Although shackling in the presence of the jury should be avoided if possible, not every incident in which a jury observes the defendant in shackles

6

requires a mistrial.'" ***Id.*** (quoting ***State v. Brooks***, 960 S.W.2d 479, 491 (Mo. banc 1997)). To implicate the concerns set forth in ***Deck***, there must be some evidence that a juror actually saw a defendant in restraints. ***State v. Snowden***, 285 S.W.3d 810, 815 (Mo.App. S.D. 2009). ***Deck*** is not directly implicated where the jury is briefly and inadvertently exposed to a defendant in restraints. ***Taylor***, 298 S.W.3d at 512.

During *voir dire* the trial court took a short break, which required the empaneled jurors to walk by Bush. Before the jurors re-entered the room, the court notified counsel that, at one point, Bush's restraints were visible. Bush's counsel moved for a mistrial. The trial court, in response to the motion for a mistrial, stated:

> I went back and sat where you could -- you could sort of see it, I guess. I really couldn't tell what it was when I sat back there where the panel is sitting on the front row. When he's standing when the panel leaves -- comes and goes from the courtroom, you're standing in between him and those members of the panel. [Defense counsel], you're there, and he's standing. And I think you'd have to know exactly what it was. I mean, I -- I think -- And I think you'd have to be looking for it.
>
> . . . .
>
> So, as indicated, I mean, I think you'd have to be looking for it. And I don't think anybody is looking for it, particularly the way Mr. Bush is dressed. So I'm going to overrule your motion for mistrial.

This case bears some striking similarities to ***State v. Green***, 307 S.W.3d 197 (Mo.App. S.D. 2010), where the appellant moved for a mistrial because the jury might have seen his restraints, but the trial court denied the motion. ***Id.*** at 200. The appellant was handcuffed while passing by the area where potential jurors were assembling. ***Id.*** The trial court indicated that between the sweater the appellant was wearing and papers in the appellant's hands, the handcuffs were not noticeable even though the appellant did have to walk past the jury assembly area. ***Id.*** This Court found:

7

. . . Appellant may have been seen by potential jurors prior to voir dire, but nothing indicates such observation included his handcuffs. Even the trial court did not notice that Appellant was handcuffed because of his sweater and papers. Nevertheless, even if a juror caught a glance of Appellant's handcuffs, a juror briefly seeing a defendant in handcuffs during the transportation process does not automatically deprive him of a fair trial and does not support a claim for a mistrial. *State v. Smith*, 996 S.W.2d 518, 523 (Mo.App. W.D.1999).

Likewise, potential jurors might have seen Bush's restraints; however, his clothing, the placement of counsel, and the layout of the courtroom made that unlikely. Without some evidence to indicate that jurors or potential jurors saw the restraints, we cannot find that the trial court abused its discretion in denying Bush's motion for a mistrial. **Snowden**, 285 S.W.3d at 815; **Taylor**, 298 S.W.3d at 512. Point I is denied.

*Point II: Evidence of Prior Acts*

Generally, we review a trial court's admission of evidence for an abuse of discretion; however, where there was no objection to the admission of the evidence, our review, if any, is for plain error. **State v. Blair**, 443 S.W.3d 677, 682 (Mo.App. W.D. 2014). To qualify for plain error review the defendant must show that the evidence admitted was evidently, obviously, and clearly in error. **State v. Brandolese**, 601 S.W.3d 519, 531 (Mo. banc 2020). "Rule 30.20 authorizes this Court, in its discretion, to review 'plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.'" **State v. McElroy**, 520 S.W.3d 493, 495 (Mo.App. W.D. 2017) (quoting Rule 30.20). In the first part of our analysis we must determine whether any plain error has occurred; if we find plain error on the face of the claim, we then determine whether the claimed error actually resulted in a manifest injustice or miscarriage of justice. **State v. Whitaker**, 405 S.W.3d 554, 559 (Mo.App. E.D. 2013).

Bush argues that, even though he did not object, testimony about his prior acts was propensity evidence that was substantially more prejudicial than probative. Although generally there is a prohibition on the use of propensity evidence, evidence of prior uncharged misconduct is admissible for other purposes such as establishing motive, intent, absence of mistake or accident, a common plan or scheme, or the identity of the defendant on trial. *State v. Miller*, 372 S.W.3d 455, 473 (Mo. banc 2012). Evidence of uncharged crimes that are part of the sequence of events or circumstances surrounding the charged offense may be admissible to present a complete, coherent picture of the overall events. *Id.* at 474.

Bush was accused at trial of throwing objects at Victim, striking her, threatening her, and destroying her property. Victim testified that while she was a student, Bush had visited her, had thrown a phone at her, had choked her, and had threatened to kill her. Victim's testimony demonstrated a history of violent conduct and tended to show Bush's intent, motive, and animosity towards her, all of which were at issue in this case.[8]

We do not see an evident, obvious, and clear error regarding the admission of the prior act evidence, without which we will not find plain error. Absent plain error our inquiry ends, and we will not consider whether a manifest injustice occurred. Point II is denied.

The trial court's judgment is affirmed.

---

[8] Bush cites to *State v. Watson*, 968 S.W.2d 249 (Mo.App. S.D. 1998), where we reversed a driver's conviction for leaving the scene of an accident when the State presented evidence that the driver had previously assaulted his wheelchair-bound mother. *Id.* at 254-55. An overabundance of testimony about the assault did not have a logical connection to the accident and so was not relevant to the motor vehicle-based conviction. Bush likewise cites to *State v. Henderson*, 105 S.W.3d 491 (Mo.App. W.D. 2003), which, like *Watson*, involved a case where the defendant's prior acts bore an illusory relationship with the charged conduct. *Id.* at 495-97.

Nancy Steffen Rahmeyer, P.J.  – Opinion Author

William W. Francis, Jr., J.  – Concurs

Jack A. L. Goodman, J.  – Concurs