

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED111569 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| | ) | 18SL-CR06496-01 |
| vs. | ) | |
| | ) | |
| MICHAEL GEORGE SMITH, | ) | Honorable Richard M. Stewart |
| | ) | |
| Defendant/Appellant. | ) | FILED: May 21, 2024 |

## OPINION

Michael George Smith ("Defendant") appeals from the judgment upon his convictions following a jury trial for three counts of statutory rape in the first degree, in violation of Section 566.062, RSMo 2000.[1] Defendant was sentenced to 25 years on each count to run consecutively, for a total of 75 years' imprisonment. We affirm the judgment of the trial court.

### Factual and Procedural Background

Defendant was charged with three counts of statutory sodomy in the first degree and one count of child pornography.[2] Defendant's case was tried before a jury on February 6-9, 2023. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial:

---

[1] Unless otherwise indicated, all further statutory references are to RSMo 2000 as amended.

[2] The possession of child pornography count was *nolle prossed* by the State.

Victim was born in 2005. She has a sister, EF, who is 18 months older than Victim.[3] Defendant is Victim's paternal step-grandfather. Victim testified that she had a good relationship with Defendant and she "loved him."

Victim testified that between 2012 and 2015, the sisters were living in their grandparents' house with Defendant, their grandmother, and their great-grandmother. The sisters spent weekdays with Defendant, and weekends with their father, AF, who was a truck driver. While at their grandparents' house, Victim slept on a fold-out bed, and EF slept on the couch.

Victim testified that Defendant would make the sisters play the "boyfriend/girlfriend game" with him. Defendant would "make out" with them and do "random little things that boyfriends and girlfriends do." Defendant would also pull down his pants and have Victim touch his penis. At the time of these incidents, Victim's grandmother was either sleeping in her bedroom or at work and great-grandmother was downstairs sleeping. During the day, Defendant would tell the girls that it was okay for them to walk around in their underwear and bras.

At the time of the offenses, Defendant had a paper route and he would get up at about 1:00 or 2:00 a.m. and come into the living room. Sometimes he would lay in bed with Victim. Defendant would put his hand under Victim's underwear and in her vagina. Defendant told Victim that if she told anyone, he would hurt her. Victim, who was between the ages of six and ten at the time, did not think that there was anything wrong with what Defendant was doing.

Victim recalled one night she was sleeping in the living room and Defendant asked if she wanted to try something new. Defendant turned Victim around on the bed and anally raped her. Defendant did this on two occasions. Victim did not tell anyone about the incidents.

---

[3] The personal identifying information of Victim and witnesses has been omitted pursuant to RSMo § 509.520 (Supp. 2023).

Victim did not understand that what Defendant was doing was wrong until she was in third grade. At that time, there was an assembly in school and Victim realized that "everything . . . this presentation is saying is what's going on at home." Victim went home and told her sister, EF, that Defendant had been touching her but did not give further details. EF said they needed to tell someone so that it would not happen again. They called their grandmother into the bathroom and EF told their grandmother. While she did not initially believe the accusations, at some point the grandmother told AF, the girls' father, that Victim had been touched by Defendant.

Shortly thereafter, AF picked up the girls and told them that they would not be staying with their grandparents anymore. AF did not call the police at that time because he did not believe they would be able to prove the allegations. After AF removed the girls from Defendant's house, Victim was never sexually assaulted by Defendant again. Sometime later, AF brought up the allegations to a cousin, CG, who was also a niece of Defendant. AF asked CG if she thought Defendant "would do anything like that." CG told AF to believe the girls.

Victim tried to tell AF more about what happened, but AF said he did not want to hear it and he "didn't want to go to jail for hurting [Defendant]." Almost two years later, in 2017, Victim decided she wanted to tell AF because she did not want anyone else to be abused and she wanted people to understand what she had endured. Victim wrote a letter and put it on AF's dresser because she did not want "to see his face when he started to read it." The letter stated:

> To dad only dad!! Hello – dad I was wanting to tell you that I need to do something about [Defendant] and we need to go to the cops or something and if I want to tell someone than [sic] I have to tell them the truth he raped me 2 times and I need to know that I am safe and I don't want it to happen to anyone [illegible]. I think about it every day like 5 times and I was wanting to do something about it because I don't want to live living the rest of my life [k]nowing I can do something about it and never do so when you get this tell me talk to me about I gave you [illegible] note because I don't want no one else to here [sic] or see me when I give this to you and it would be [illegible] for me to [illegible] rite [sic] now Love you. XOXO [K].

3

After reading the letter, AF was very upset. He put the note in his safe and went to talk to his cousin, CG. He was conflicted about what to do after the conversation.

Later that year, AF's grandmother passed away. In September 2017, AF and his girlfriend went to Defendant's house to get some of his belongings that his grandparents had left him. When AF knocked on the door, AF's mother answered and asked him to wait outside while she and AF's girlfriend gathered his belongings. AF waited on the front porch. Defendant appeared and a confrontation erupted between Defendant and AF about money. AF then asked Defendant what he had done to the girls. A physical altercation ensued. Eventually, AF retrieved his belongings, and he and his girlfriend left the house.

In January 2018, AF was arrested for assaulting Defendant and burglarizing the house. When AF was questioned by police, he told them about the allegations of sexual abuse and Victim's letter. AF then took the girls to the Child Advocacy Center ("CAC") where they were interviewed by a forensic specialist.

In February 2018, Victim participated in a CAC interview in which she disclosed that Defendant had sexually abused her between kindergarten and third grade and had anally raped her on two occasions. She also revealed the "boyfriend/girlfriend game," that Defendant said it was okay for the girls to walk around the house in their bras and underwear, and that Defendant would make Victim touch his penis.

EF also participated in a CAC interview. EF stated that Victim told her about the sexual abuse by Defendant and that they subsequently told their grandmother. EF also talked about playing the "boyfriend/girlfriend game" with Defendant and that Defendant had told them not to tell their grandmother.

4

Following the CAC interviews, the police seized Victim's letter to AF. Later, they arrested Defendant, and Defendant was charged with three counts of statutory sodomy in the first degree.

Police also interviewed the cousin, CG. CG stated that decades earlier, when she was between the ages of 11 and 14, Defendant, who was CG's uncle, lived with her family. She reported that Defendant would sleep with her and put his fingers inside her vagina and his penis on her back. CG stated that Defendant told CG that she was his "girlfriend."

The jury found Defendant guilty on all three counts of first-degree statutory sodomy and assessed sentences of 25 years' imprisonment on each count. The trial court ordered a Sentencing Assessment Report, sentenced Defendant according to the jury's recommendations, and ordered the three sentences to run consecutively. This appeal follows.[4]

## Discussion

### *Propensity Evidence*

In Point I, Defendant argues the trial court abused its discretion in allowing the State to present the propensity evidence of CG's testimony because the evidence was more prejudicial than probative. The trial court did not abuse its discretion in admitting this evidence.

"Trial courts are 'vested with broad discretion to admit or exclude evidence.'" *State v. Pierce*, 678 S.W.3d 115, 121 (Mo. App. S.D. 2023) (quoting *State v. Tisius*, 362 S.W.3d 398, 405 (Mo. banc 2012)). "On appeal, we review those decisions for abuse of discretion and will reverse only when the error was so prejudicial as to deprive the defendant of a fair trial." *Pierce*, 678 S.W.3d at 121. Admission of evidence to show a criminal defendant's propensity to commit

---

[4] To avoid unnecessary repetition, additional facts relevant to each of Defendant's points on appeal will be set forth, as needed, in the Discussion section below.

an offense is generally disfavored, but both federal and state law recognize an exception

regarding crimes of a sexual nature against children. *State v. Williams*, 548 S.W.3d 275, 281-286

(Mo. banc 2018); Fed. R. Evid. 414.

> Article I, Section 18(c) of the Missouri Constitution provides:
>
> [I]n prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged. The court may exclude relevant evidence of prior criminal acts if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

"Propensity evidence is evidence of uncharged crimes, wrongs, or acts used to establish that

defendant has a natural tendency to commit the crime charged." *State v. Shockley*, 410 S.W.3d

179, 193 (Mo. banc 2013) (internal punctuation omitted).

Section 18(c) specifies that relevant evidence may be excluded when the risk of unfair

prejudice substantially outweighs its probative value. *State v. Brown*, 596 S.W.3d 193, 208 (Mo.

App. W.D. 2020). To be admissible, evidence must be both logically and legally relevant. *State*

*v. Burge*, 596 S.W.3d 657, 661 (Mo. App. S.D. 2020). Evidence is logically relevant when it

"tends to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence[.]" *Id.* (quoting *State v.*

*Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002)). "Legal relevance weighs the probative value of

the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury,

undue delay, waste of time, or cumulativeness." *State v. Peirano*, 540 S.W.3d 523, 527 (Mo.

App. S.D. 2018) (quoting *State v. Anderson*, 306 S.W.3d 529, 538 (Mo. banc 2010)). "[T]he

circuit court retains substantial discretion in admitting or excluding [propensity] evidence even if

there is a danger of some prejudice." *State v. Prince*, 534 S.W.3d 813, 821 (Mo. banc 2017).

Before Defendant's trial commenced, the State filed a notice of its intent to present propensity evidence that Defendant had sexually abused CG in the early 1980s when CG was between 11 and 14 years old. The State specified, "The specific act was Defendant put his fingers into the vagina of C.G."

On January 27, 2023, the trial court conducted a pre-trial hearing on the State's request to present propensity evidence. The trial court received copies of CG's deposition and recorded statement. The trial court observed that the nature of the acts was similar enough to be probative, though there was "a long time" between the events. The trial court took the matter under advisement. On January 30, 2023, the trial court issued its order granting the State's request to admit the propensity evidence through the testimony of CG. The court found that the evidence was both logically and legally relevant, and the probative value of the evidence outweighed the risk of unfair prejudice to Defendant.

At trial, CG testified that she had a conversation with AF about Defendant. CG asked AF if Victim or EF had ever said anything about Defendant abusing the girls. CG told AF that he should believe his daughters because nobody believed her. AF asked CG what had happened, but CG did not tell him. CG testified that in 1982, when she was 11 or 12 years old, Defendant lived in the same house with CG. CG testified that Defendant used to touch her, cuddle with her, and put his hands in her pants. Defendant would lay behind her on the bed, put his hands into her pants, and put his fingers inside of her. Defendant told CG that she was his "girlfriend."

On these facts, the risk of unfair prejudice did not substantially outweigh the probative value of CG's testimony, which provided "relevant evidence of prior criminal acts." The act to which CG testified was similar to one of the acts to which Victim testified and with which Defendant was charged. Moreover, the age of the victims was similar, as was the relationship of

7

the victims to Defendant. Courts give great weight to the similarity of the acts and the ages of the victims. *Pierce*, 678 S.W.3d at 122; *Williams*, 548 S.W.3d at 289.

Additionally, Victim's testimony was more graphic than CG's testimony, and CG's testimony did not overshadow the evidence of the crimes charged. *Williams*, 548 S.W.3d at 290-91. And although 30 years had elapsed between the events involving CG and those involving Victim, that timespan did not render the evidence inadmissible given the similarity of acts and victims. See *Pierce*, 678 S.W.3d at 122 (finding a 40-year lapse between charged acts and those against propensity witness did not render evidence inadmissible given the highly probative nature of the evidence); *Peirano*, 540 S.W.3d at 528 ("The passage of time alone will not render evidence inadmissible due to its remoteness."); *Prince*, 534 S.W.3d at 820 (collecting cases finding acts 20 to 30 years past were not too remote to preclude admissibility). In addition, the State had an "appreciable" need for CG's testimony because there was no forensic evidence. *Pierce*, 678 S.W.3d at 123; *State v. Davison*, 636 S.W.3d 588, 594 (Mo. App. W.D. 2021).

Finally, any risk that the jury would seek to punish Defendant for his unadjudicated acts against CG was minimized by an instruction admonishing the jury that Defendant was on trial for only the charged offenses, and the jury could not find Defendant guilty because they believed he may have committed other offenses in the past. The jury is presumed to follow the court's instructions. *State v. Minor*, 648 S.W.3d 721, 731 (Mo. banc 2022).

Based on the foregoing, the trial court did not abuse its discretion in allowing CG's testimony. The testimony was logically and legally relevant, and its probative value was not substantially outweighed by any undue prejudice. Point I is denied.

*Rape Shield*

8

In Point II, Defendant argues the trial court abused its discretion by excluding "evidence of prior allegations of sexual conduct" made by CG in that this evidence was not barred by Section 491.015, the Rape Shield Statute. Defendant argues the trial court denied him the ability to challenge CG's credibility and violated his right to a fair trial by precluding him from fully cross-examining CG. Defendant's Point II fails for several reasons.

Before we can address the merits of Defendant's point on appeal, we must decide whether it is preserved. At the outset, we observe that Defendant's point is not based upon the same theory as that presented to the trial court. On appeal, Defendant argues the Rape Shield Statute may not be applied to deny a defendant his constitutional rights, which includes the right to impeach witnesses by cross-examination. At trial, by contrast, Defendant argued the evidence he wished to present was admissible as an exception to the Rape Shield Statute in that it was evidence of the immediate surrounding circumstances of the alleged crime. Specifically, in his "Notice of Defendant's Intent to Offer Evidence under Section 491.015," Defendant denied that he intended to challenge CG's truthfulness or the truthfulness of CG's allegations, and instead argued that the evidence "would provide the factfinder with a complete and coherent picture of the events leading up to the alleged crimes and is admissible as part of the *res gestae*."

Because Defendant's point on appeal differs from his position at trial, the point is not preserved and is subject to only plain error review. *State v. Lewis*, 514 S.W.3d 28, 31 (Mo. App. S.D. 2017). Rule 30.20 authorizes us to review, in our discretion, plain errors affecting substantial rights if failing to grant relief would result in a miscarriage of justice or manifest injustice. *State v. Whitaker*, 405 S.W.3d 554, 558-59 (Mo. App. E.D. 2013). Defendant has not requested plain error review, and whether to grant or decline plain error review is within our discretion. *Id.*

9

In deciding whether to conduct plain error review, we first determine whether the claim establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). Errors are plain if they are evident, obvious, and clear. *State v. Reeder*, 182 S.W.3d 569, 574 (Mo. App. E.D. 2005). We will grant relief under the plain error standard only if we find that the error substantially affected the defendant's rights such that a manifest injustice or a miscarriage of justice would result if the error is left uncorrected. *Id*.

Section 491.015(1), the Rape Shield Statute, provides:

In prosecutions under chapter 566 or prosecutions related to sexual conduct under chapter 568, opinion and reputation evidence of a victim's or witness' prior sexual conduct, acts, or practices is inadmissible at any trial, hearing, or court proceeding and not a subject for inquiry during a deposition or discovery; evidence of specific instances of a victim's or witness' prior sexual conduct, acts, or practices or the absence of such instances or conduct is inadmissible at any trial, hearing, or any other court proceeding, and not a subject for inquiry during a deposition or discovery, except where such specific instances are:
      (1) Evidence of the sexual conduct of a victim or witness with the defendant to prove consent where consent is a defense to the alleged crime and the evidence is reasonably contemporaneous with the date of the alleged crime; or
      (2) Evidence of specific instances of sexual activity showing alternative source or origin of semen, pregnancy or disease;
      (3) Evidence of immediate surrounding circumstances of the alleged crime; or
      (4) Evidence relating to the previous chastity of the complaining witness in cases, where, by statute, previously chaste character is required to be proved by the prosecution.

Importantly, Section 491.015 "does not preclude introduction of evidence of prior *allegations* by an alleged victim of sexual abuse if that evidence is offered to impeach the credibility of the victim as a witness." [emphasis added.] *State v. Scott*, 78 S.W.3d 806, 810 (Mo. App. S.D. 2002); *State v. Montgomery*, 901 S.W.2d 255, 256 (Mo. App. E.D.1995); *see also State v. Davis*, 186 S.W.3d 367, 374 (Mo. App. W.D. 2005) ("Evidence of prior allegations by an alleged victim of sexual abuse if that evidence is offered to impeach the credibility of the

10

victim as a witness does not violate the rape shield law."); *see also State v. Lampley*, 859 S.W.2d 909, 911 (Mo. App. E.D. 1993) (Evidence of a victim's prior complaints, as opposed to prior sexual conduct, does not fall within the ambit of Section 491.015).

Here, Defendant argues he should have been permitted to cross-examine CG about prior allegations she made against TS and RC, two other men by whom she claimed to have been sexually abused. Defendant maintains the Rape Shield Statute does not preclude evidence of prior allegations if that evidence is offered to impeach the credibility of the victim as a witness. While Defendant is correct on the law, in his offer of proof, he did not ask about CG's having made any allegation to anyone. Instead, he asked about the prior sexual conduct itself in an attempt to impeach CG's memory and suggest that CG confused the sexual assault by Defendant with sexual assaults by other men:

> Q. When you stayed with [TS] that summer when you were 11 –
> A. Yes.
> Q. -- you were sexually assaulted by [TS]. Correct?
> A. Yes.
> Q. And the trauma from that sexual assault affected your memory. Correct?
> A. No.
> Q. And between the ages of 11 and 14, [RC], your mom's boyfriend, attempted to sexually assault you. Correct?
> A. Attempted to.
> Q. And that included you waking up in the middle of the night with his hands in your vagina. Correct?
> A. No.
> Q. That never happened?
> A. No.

Defendant's proposed cross-examination, as set out in the offer of proof, was not about any allegations made by CG. It was about specific instances of prior sexual acts themselves, apparently offered for a purpose not within any of the exceptions set forth in the Rape Shield Statute. The evidence therefore was inadmissible.

Defendant counters that the evidence was admissible and necessary to allow him to present a complete defense and violated his right to confront and cross-examine the witness against him. The trial court "was entitled to balance the policy behind the rape shield statute against the attenuated inference" that Defendant sought to draw behind the proposed cross-examination. *State v. Campbell*, 600 S.W.3d 780, 789 (Mo. App. W.D. 2020).

Defendant failed to show that the specific instances of prior sexual acts with TS or RC had anything to do with Defendant's sexual assault of CG or Victim, or would have impeached CG's testimony. In Defendant's offer of proof, CG denied that the trauma from TS's sexual assault affected her memory or that she ever woke up in the middle of the night with RC's hand in her vagina. The specific instances of sexual conduct involving TS and RC therefore did not tend to impeach CG's testimony regarding the sexual assault by Defendant. Absent a showing that the evidence in question would have impeached CG, Defendant has not demonstrated that the trial court abused its discretion in excluding the cross-examination or that Defendant was prejudiced thereby. The scope of cross-examination and determination of matters that bear on witness credibility are largely within the discretion of the trial court. *Davis*, 186 S.W.3d at 373.

For these reasons, Defendant has not demonstrated any manifest injustice or miscarriage of justice, and there is no evident, obvious, and clear error. We perceive no error, plain or otherwise. Point II is denied.

*Victim's Out-of-Court Statements*

In Point III, Defendant argues the trial court erred in admitting Victim's out-of-court statements to her father, AF, and to the forensic interviewer, AR, during the CAC interview because those statements did not provide sufficient indicia of reliability. Defendant is incorrect.

12

We review a trial court's decision to admit a child's statements under Section 491.075 for abuse of discretion. *State v. Ragland*, 494 S.W.3d 613, 622–23 (Mo. App. E.D. 2016). The out-of-court statements of a child are admissible in a criminal trial under Section 491.075 as substantive evidence to prove the truth of the matter asserted if, among other things, the court finds after a hearing that "the time, content and circumstances of the statement provide sufficient indicia of reliability." Section 491.075.1(1).

The reliability of a child's statement is determined by looking at the totality of the circumstances as set out in the evidence presented at the Section 491.075 hearing. *Id*. at 623. Several non-exclusive factors aid the analysis: (1) whether the statements were made spontaneously and consistently repeated; (2) the mental state of the child; (3) whether the child had a motive to fabricate; (4) whether the child's knowledge of the subject matter is unexpected at that age; (5) the amount of time between when the acts occurred and when the statements are made; and (6) the technique employed by the interviewer. *Id*. All of these factors are designed to assess whether the child "was particularly likely to be telling the truth when the statement was made." *Id*. Defendant argues Victim's statements were not sufficiently reliable based primarily on the lack of spontaneity of the out-of-court statements and the circumstances surrounding those statements.

At the Section 491.075 hearing, AR described the forensic interview protocol she employed during her interview of Victim and her sister. AR stated that Victim knew she was there to talk about Defendant and then proceeded to describe the abuse. Victim disclosed that between kindergarten and third grade, Defendant would make her and her sister play a "boyfriend girlfriend game" which included "making out" and touching "down there," referencing Victim's vagina. Victim also stated that Defendant made her put her hand on his

penis. Victim stated there were times when Defendant anally raped her.[5] AR testified that Victim was able to provide details of the incidents and explained that, as a forensic interviewer, she was trained to look for a child's ability to describe things she should not be able to describe unless she had actually experienced them. AR referred to these as "sensory or contextual details." According to AR, Victim described events before and after the incidents and provided "a lot of sensory details."

Based on the evidence at the hearing, Victim's statements to AR in the CAC interview were spontaneous, as they resulted from open-ended questioning and there was no evidence that Victim was prompted or pressured to make disclosures by anyone. *See State v. Antle*, 670 S.W.3d 66, 73 (Mo. App. W.D. 2023) ("We have consistently emphasized that a lack of leading questions, pressure tactics, and excessive prompting are important factors in finding that minor victims' out-of-court statements are spontaneous and have sufficient indicia of reliability.").

AF, Victim's father, also testified at the Section 491.075 hearing. He stated that, after he removed the girls from their grandparents' house, Victim told him that Defendant's abuse "was just touching," and so AF "just kind of wrote it off" and kept the girls away from Defendant. Victim told AF that Defendant had touched her "private parts . . . down there" but had not been specific. AF did not call the police because "you can't really prove touching," so he believed "what's the point." A year or two later, AF came home and found a letter from Victim in his bedroom. AF put the letter in his safe. A couple of months later, AF went to his parents' house to

---

[5] Victim also described several incidents where she believed Defendant was taking pictures of her and stated that she later found a picture of herself on Defendant's phone where she was wearing her favorite underwear. Victim deleted the picture because she thought it was "inappropriate" for Defendant to have it.

14

retrieve his belongings. AF had an altercation with Defendant and, at that time, notified the police of the alleged sexual abuse.

Again, Victim's statements to AF, her father, were spontaneous. Contrary to Defendant's argument, nothing in the record suggests Victim's disclosures were "direct responses to her father's interrogation." To the contrary, the record reflects that Victim voluntarily disclosed the sexual assaults to AF in her initial disclosure and in her letter, without prompting by AF. There was also a lack of any motive for Victim to fabricate the incidents. By the time Victim wrote the more detailed letter, she already had been removed from Defendant's home and was no longer being abused.

Defendant nonetheless maintains that AF had a motive to lie to the police to get back at Defendant after the physical altercation at Defendant's house. While that may be so, the issue here, as framed by Defendant on appeal and as a matter of law, is the reliability of Victim's out-of-court statements to AF, not AF's statements to police. *See Ragland*, 494 S.W.3d at 625; *State v. Gillard*, 986 S.W.2d 194, 197 (Mo. App. S.D. 1999); *State v. White*, 873 S.W.2d 874, 877 (Mo. App. E.D. 1994).

Finally, Victim's letter to her father was consistent with what she reported in her CAC interview regarding having been raped two times. It also reflected the fear and emotional pain Victim felt as a result of Defendant's abuse as well as her need to report it to the police so she could feel safe.[6]

For all the foregoing reasons, the trial court did not abuse its discretion in admitting Victim's out-of-court statements to the forensic interviewer and to her father. The statements

---

[6] Defendant argues that the disclosures in the letter were "substantially different" from her prior disclosures to her father. As the State points out, however, "the fact that Victim was more detailed in her letter as to the nature of the abuse than she was when she made her first disclosure [to her father] does not make her disclosures inconsistent."

bore sufficient indicia of reliability and, therefore, were admissible under Section 491.075. Point III is denied.

## *Mistrial*

In Point IV, Defendant argues the trial court erred in overruling his motion for mistrial based on a portion of the testimony of AR, the expert forensic interviewer. Specifically, Defendant contends the State elicited "particularized" testimony from AR which was prejudicial and usurped the province of the jury because AR was led to improperly comment directly on Victim's credibility. We conclude otherwise.

As an initial matter, Defendant contends this claim should be considered preserved. However, Defendant's objection and request for mistrial were untimely, and thus Defendant's claim may be reviewed for only plain error. *State v. Loper*, 609 S.W.3d 725, 733 (Mo. banc 2020) ("For an allegation of error to be considered preserved and to receive more than plain error review, it must be objected to during the trial *and* presented to the trial court in a motion for new trial."); Rule 78.09 (requiring an objection to be specific and made contemporaneously with the purported error).

"Mistrial is a drastic remedy and should be employed only in the most extraordinary circumstances." *State v. McFadden*, 369 S.W.3d 727, 740 (Mo. banc 2012) (internal quotation omitted). Whether to grant a mistrial "is left to the discretion of the trial court because the trial court is in the best position to observe the impact of the problematic incident." *State v. Roberts*, 948 S.W.2d 577, 605 (Mo. banc 1997).

There are two types of expert testimony regularly challenged on appeal: "general" and "particularized." *State v. Williams*, 858 S.W.2d 796, 798-99 (Mo. App. E.D. 1993); *see also State v. Churchill*, 98 S.W.3d 536, 539 (Mo. banc 2003). "General" expert testimony describes

16

"behaviors and other characteristics commonly found in those who have been the victims of sexual abuse." *Id*. A trial court has wide latitude in admitting such testimony. *Id*. "Particularized" testimony is testimony concerning the expert's opinion of the alleged victim's credibility. *Id*. at 799. Particularized testimony on witness credibility is strictly prohibited as it invades the province of the jury and "presents the danger that jurors may be over-awed by, or may defer too quickly to, the expert's opinion." *State v. Foster*, 244 S.W.3d 800, 802 (Mo. App. S.D. 2008). Defendant argues that while AR mostly provided general expert testimony, the final question the State asked led AR to provide prejudicial, particularized testimony which improperly commented directly on Victim's credibility.

At trial, AR testified on direct examination regarding her interviews with Victim and her sister, EF, and explained that during a forensic interview, she looks for "sensory detail[s]" that a child victim is able to share about the traumatic event. AR defined a sensory detail as follows:

> A sensory detail would be those including the senses. Those that typically an average person can't make up or fabricate if they don't have that experience. So I'm looking for things that a child might have seen, heard, how it tasted, how it felt. Those are the kind of questions and details that I'm seeking during a forensic interview process.

During cross-examination, defense counsel returned to the issue of sensory details:

> Q. And in terms of sensory details, you were looking for the child to describe something that they should not be able to describe unless they have actually experienced the incident of abuse. Correct?
> A. That's one of the things we look for, yes.
> Q. But details as to what the couch looked like, what the bed sounded like, the colors of the blankets, those are details that [Victim] knew regardless of whether the incident happened. Correct?
> A. Sure, yes.

On redirect examination by the State, the following exchange occurred:

> Q. [AR], defense counsel asked you about sensory details. Correct?
> A. Yes.

Q. And I believe she asked you about [Victim] describing the color of a blanket and sheets and asked, wouldn't [Victim] know this even if the sexual assault didn't happen? Didn't she ask something like that?
A. Yes.
Q. And fair to say, even if the sexual assault didn't happen, she would probably know the color of the blankets and the sheets. Correct?
A. Correct.
Q. Do you recall [Victim] giving you details about how it felt when she said, he may have spermed inside of me?
A. Yes, I do.
Q. Do you remember how she described that when you asked her to describe what she meant?
A. Yes. Instead of assuming what she meant by that, in the language that she used during the forensic interview, I asked her to describe that. To which she then indicated that it was kind of like if you had a water bottle and shot it into your mouth, that was the same feeling that occurred when [Defendant] put his penis in her butt.
Q. Any way she would know that if anal rape hadn't happened?
A. Typically, we don't get that level of detail if a child has not had that experience.

Examination of AR ended at that point, and the jury was dismissed for the day.

After the jury left, defense counsel stated the following:

I did fail to object, but that last question – I would like stricken from the record, that last question and [AR's] answer stricken from the record in that it violates the defendant's Motion in Limine Number 1, any testimony or argument from [AR] regarding the alleged victim statements being reliable, credible, or consistent with sexual abuse. Such testimony would improperly invade the province of the jury and improperly bolster the witness' credibility. She basically said that we wouldn't have gotten that level of detail unless sexual assault happened, which is directly going – saying that her statement is consistent with sexual abuse.

Following a lengthy exchange, the prosecutor argued that defense counsel opened the door to the subject of sensory details by eliciting that Victim would know the color of sheets and blankets on the bed even if the alleged abuse did not occur. The trial court overruled defense counsel's objection. A discussion was then held off the record, after which defense counsel requested a mistrial based on AR's testimony that "basically just confirmed" that Victim was sexually assaulted. The trial court denied the request for a mistrial and recessed for the evening.

18

The next day, outside the presence of the jury, the trial court announced that it had considered Defendant's untimely objection and was inclined to sustain the objection. Defense counsel confirmed that she wanted the answer stricken and the jury instructed to disregard the testimony. Defense counsel then renewed the motion for a mistrial and also requested a limiting instruction if the court would not grant a mistrial. The trial court denied the mistrial, but advised the jury as follows:

> Ladies and gentlemen, yesterday at the conclusion of the testimony of [AR] from the CAC or the Children's Advocacy Center, a question was asked of her by the State on redirect. That question and her answer is as follows: "Question: Any way she would know that if anal rape hadn't happened?" "Answer: Typically, we don't get that level of detail if a child has not had that experience." I am striking that question and answer from the record, and I am advising you as the jury to disregard that question and answer from this point forward.

Thus, according to the trial record, Defendant opened the door to the prosecutor's question, the question and answer were stricken, and the jury was instructed to disregard them. Under most circumstances, a trial court acts within its discretion and cures error in the admission of evidence by withdrawing the improper evidence and instructing the jury to disregard it, rather than declaring a mistrial. *State v. Rice*, 573 S.W.3d 53, 74 (Mo. banc 2019). Moreover, the jury is presumed to follow the court's instructions, absent any indication to the contrary. *Minor*, 648 S.W.3d at 731.

Finally, while the prosecutor's question was specific as to Victim's knowledge, AR responded more generally that "[t]ypically" a child does not express such sensory detail if she has not experienced what she described. Therefore, AR's answer, like much of her other testimony elicited by both the State and Defendant, referred to a sensory detail a child would not be expected to know without having experienced the alleged sexual assault. The answer decidedly did not express an opinion of Victim's credibility, which would be impermissible. *See*

19

*Williams*, 858 S.W.2d at 798-99. The trial court did not commit error, plain or otherwise, in denying Defendant's request for a mistrial. Point IV is denied.

Conclusion

The circuit court's judgment is affirmed.

_____<br>Cristian M. Stevens, Judge

Robert M. Clayton III, Presiding Judge and
Philip M. Hess, Judge: concur.